386 So.2d 342 (1980)
STATE of Louisiana
v.
WALDEN BOOK COMPANY, Southland Corporation, General Host, Pearson's Pharmacy, Shreveport News Agency, Inc. et al.
No. 67768.
Supreme Court of Louisiana.
July 3, 1980.
Concurring Opinion August 15, 1980.
*343 David W. Robertson, Gravel, Robertson & Brady, Alexandria, for relator-intervenor.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., Edward E. Roberts, Asst. Dist. Atty., for respondents.
DIXON, Chief Justice.
The question in this case is whether the June, 1980 issue of Penthouse magazine is protected under the First Amendment of the United States Constitution and Article 1, § 7 of the Louisiana Constitution of 1974 (freedom of the press). Certain pornography is not accorded the protection of the First Amendment, and may be regulated by the states under strictly drawn statutes and under federal constitutional standards as found by the United States Supreme Court. In Louisiana pornographic material is regulated under the carefully drafted "obscenity" statute, R.S. 14:106.
Louisiana's statutory scheme for the regulation of obscene conduct and material in R.S. 14:106 defines the crime of obscenity in several ways, and makes criminal the display, distribution and sale of "obscene material," which is further defined in some detail. Before there can be any prosecution, or even arrest, for distribution of obscene material (except for "explicit, closeup depiction of human genital organs so as to give the appearance of the consummation of ultimate sexual acts") there must be an adversary hearing, the sole issue at which "shall be whether the material is obscene."
On May 19, 1980 the state instituted such an adversary hearing under R.S. 14:106 F against five Rapides Parish booksellers, seeking a declaration that the June, 1980 issue of Penthouse magazine is obscene. All five defendants, instead of contesting the proceeding, chose to remove the publication from their shelves. Penthouse, Ltd., publisher of the magazine, intervened to defend the obscenity charge.[1] The district *344 judge found the magazine to be obscene. We reverse the ruling of the district court and find that the June, 1980 issue of Penthouse magazine is not obscene because the publication, taken as a whole, does not lack serious literary, artistic, political, or scientific value under R.S. 14:106A(3).
The district court's determination that material is or is not obscene presents an issue of law fully reviewable by this court. See R.S. 14:106F(3). The factual determination of obscenity by the district judge is subject to full appellate review, to meet constitutional standards designed to effectuate freedom of expression. Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); State v. Luck, 353 So.2d 225 (La.1977). The United States Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) recognized that every obscenity case involves an exercise of constitutional judgment, and that the scope of review must be broader than that of a more conventional factual determination. For this reason there must be an independent review to determine if the challenged material is in fact "obscene."
The United States Supreme Court established basic guidelines governing obscenity in the Miller case, supra, and these guidelines have been followed in R.S. 14:106. That statute defines obscene material as:
"... any tangible work or thing which the trier of fact determines (a) that the average person applying contemporary community standards would find, taken as a whole, appeals to the prurient interest, and (b) depicts or describes in a patently offensive way, hard core sexual conduct . . . and (c) the work or thing taken as a whole lacks serious literary, artistic, political, or scientific value."
In State v. Luck, supra, this court established the rule that the state bears the burden of proving that material is obscene beyond a reasonable doubt. This rule accomplishes the statutory purpose of preventing undue invasions or inhibitions of constitutionally protected expression. See McKinney v. Alabama, 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976). Therefore, proof of each of the three elements of obscene material must be established beyond a reasonable doubt.
An examination of the magazine reveals that the state has proven beyond a reasonable doubt that: the magazine taken as a whole appeals to the prurient interest at least in effect (the sexual orientation is neither minor nor subordinate); and depicts or describes in a patently offensive way, hard core sexual conduct. Whether the magazine, taken as a whole, lacks serious literary, artistic, political, or scientific value requires a closer analysis.
There has been hardly any development in the jurisprudence of this essential element of "obscene material" since Miller v. California, supra. The meaning of "work, taken as a whole," occupies a significant position in the test for obscenity. In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the United States Supreme Court held that an entire book could not be condemned as obscene because of isolated obscene passages in it. "Taken as a whole" reflects a standard which would permit the banning of unarguably obscene work only as a discrete unit.
The United States Supreme Court has examined several magazines, using the "taken as a whole" standard since the isolated excerpt approach was first rejected in Roth. In Manual Enterprises v. Day, 370 U.S. 478, 489, 82 S.Ct. 1432, 1438, 8 L.Ed.2d 639, 648 (1962), the court rejected the government's "isolated excerpt" approach, stating:
"... Whether `hard-core' pornography, or something less, be the proper test, we need go no further in the present case than to hold that the magazines in question, taken as a whole, cannot, under any permissible constitutional standard, be *345 deemed to be beyond the pale of contemporary notions of rudimentary decency. We cannot accept in full the Government's description of these magazines which, contrary to Roth ..., tends to emphasize and in some respects overdraw certain features in several of the photographs, at the expense of what the magazines fairly taken as a whole depict...."
Again, in Ginsburg v. United States, 383 U.S. 463, 466, 86 S.Ct. 942, 945, n.5, 16 L.Ed.2d 31, 35 (1966), the court stated:
"Our affirmance of the convictions for mailing EROS and Liaison is based upon their characteristics as a whole, including their editorial formats, and not upon particular articles contained, digested, or excerpted in them. Thus we do not decide whether particular articles, for example, in EROS, although identified by the trial judge as offensive, should be condemned as obscene whatever their setting."
The language of Manual Enterprises and Ginsburg supports the idea that magazines generally are to be considered as whole works even though they are made up of separate articles. Penthouse International, Ltd. v. McAuliffe, 610 F.2d 1353 (C.A. 5th Cir. 1980). An exception occurs when there is a sham attempt to insulate obscene material with non-obscene material. See Kois v. Wisconsin, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972). The classic example of such a sham is the insertion of obscene material between books of the Bible.
Only by taking the magazine as a whole can it be determined whether it lacks serious literary, artistic, political, or scientific value.[2] The requirement that the value be "serious" does not mean that humorous or irreverent vehicles for value are to be rejected. The addition of the "serious" element allows the trier of fact to look to the intent upon which the insertion of literary, artistic, political, or scientific material is based. If that intent is to convey a literary, artistic, political, or scientific idea, or to advocate a position, then the intent is "serious." See Schauer, The Law of Obscenity, The Bureau of National Affairs, Inc. (1976).
In order to determine whether the magazine, taken as a whole, lacks serious value, it is necessary to weigh those portions of the magazine which possess serious value against those which do not. The contents of the magazine must be balanced quantitatively and qualitatively to take the work as a whole.
An analysis of the magazine reveals the following quantitative results:
Total pages, 228;
Full page advertisements (of nationally advertised products), 65;
Articles with serious value, 67 pages;
Articles lacking serious value, 96 pages.
The editorial policy of Penthouse magazine is to provide entertainment for men. The features in the June, 1980 issue of Penthouse are consistent with the editorial philosophy. Included is an article about how the economy is affected by the interactions of OPEC and the United States banking industry; an article about the execution of a Saudi Arabian princess which was the subject of a controversial PBS television documentary; an essay entitled "Stop the Draft" which explores why the volunteer army is not working; an interview with child evangelist Michael Lord; an article discussing the pros and cons of various cameras; an excerpt from a new novel about the goings on in a circus; a fashion layout showing swimwear; a consumer report on the Volkswagen Rabbit convertible; reviews of travel spots, movies, books and music, in addition to stories and articles dealing with sex-related subjects and photographs of nude women which depict hard-core sexual conduct.
Each serious article bears the name of the author, who is further identified with picture and thumbnail sketch in an introductory essay. Like the national advertising, the *346 articles are like those to be found in many other periodicals which contain little or no "obscene" material. The subject of Robert Sherrill's article on OPEC and the American banking and financial interests is of great political and economic importance, is advertised on the cover of the magazine, reviewed by the editors in the introductory essay, and is probably the most important article in the magazine. It is authoritatively presented and is a product of substantial research and expertise.
"The Death of a Princess" is an article of current interest on a subject of sociological importance by Andrew Duncan, who is introduced as an "expert on the Arab world."
The excerpt from "Walking on Air" by Pierre Delattre is identified as part of a novel "which will be published by Houghton Mifflin." This court is not prepared (nor qualified) to say it lacks serious literary value. "Stop the Draft" is a serious, if not frantic, exposition of the reasons opposing a political problem peculiarly affecting the audience likely to be attracted to the sexual content of the magazine.
These articles are not a sham; they are not counterfeit. They are of a kind frequently and traditionally found in periodicals of general interest, particularly those not directed to a female audience. The subject matter is important and current. These articles convey ideas, and purport to convey serious information. They do not lack serious political and scientific value, nor even serious literary value.
Even though a magazine depicts hard core sexual conduct which appeals to the prurient interest and is patently offensive, under our statute it cannot be obscene unless "taken as a whole, it lacks serious value." We cannot say that this magazine, taken as a whole, lacks serious political or scientific or literary value beyond a reasonable doubt.
Therefore, the district court's finding that the June, 1980 issue of Penthouse magazine is obscene is reversed.
MARCUS and LEMMON, JJ., dissent and assign reasons.
BLANCHE, J., concurs and assigns reasons.
MARCUS, Justice (dissenting).
In my view, we need consider the whole magazine only where there is some connection between the patently offensive section and the magazine as a whole. In the instant case, there is no such connection. Therefore, we need consider only the patently offensive section which clearly lacks any serious literary, artistic, political or scientific value. Since it also appeals to the prurient interest and depicts hard-core sexual conduct in a patently offensive way, I consider it to be obscene. Accordingly, I respectfully dissent.
LEMMON, Justice, dissenting.
When applied to a magazine containing numerous unrelated articles, the phrase "taken as a whole" in R.S. 14:106A(2) means that each article must be examined in its entirety for serious literary, artistic, political or scientific value. The majority's interpretation of that phrase allows a publisher to publish 96 pages of obscene materials, which could not legally be published alone, and to evade the statutory prohibition by adding 67 pages of totally unrelated materials which themselves have literary, artistic, political or scientific value. Approval of the sham procedure does violence to the letter and the spirit of the obscenity statute.
BLANCHE, Justice (concurring).
The procedural posture of the case is unique and requires examination. It began as a criminal prosecution of five places of business (named as defendants) which are accused of violation of R.S. 14:106(F)[1] by *347 selling material defined as obscene by R.S. 14:106(A)(3). According to the procedure established by this statute, before the defendants can be convicted there must first be a determination that the material involved is obscene. The material in question is the June, 1980 issue of "Penthouse" magazine.
At the hearing held for the purpose of determining the preliminary question of obscenity, four of the defendants did not appear. However, a legal representative for the publisher, Penthouse International, Ltd., filed a petition of intervention alleging significant economic interest in the case;[2] the attorney for one of defendants, Walden, also represented the intervenor. Penthouse was permitted to "intervene" in the case. Upon a finding by the court below that the June issue of the magazine was obscene, the intervenor alone applied to this Court for writs, which we granted.
The question of the propriety of this procedure is one which should be addressed and resolved before addressing the substantive question as to whether this issue of "Penthouse" fits the legal definition of obscenity.
The procedural law established in this state does not provide for intervention in a criminal proceeding, though intervention does exist in civil proceedings.[3] The determination made at the preliminary hearing pursuant to R.S. 14:106 is criminal. State v. Luck, 353 So.2d 225, 228 (La.1977).[4] *348 Though not specifically established by the law of this state, when a question has a direct effect on the First Amendment rights of one who produces material which is alleged to be obscene, that person (whether a real person or a legal person, such as a corporation) must also be before the court, and the constitutional guarantees of due process require that no ruling as to the obscenity be made in the absence of the one whose fundamental rights may be affected. Otherwise, there may well be a taking of property without due process. Judicial efficiency will best be served by litigating questions which affect producers (e. g. filmmakers, writers, publishers) in the same hearing with the criminal prosecution of those selling or distributing the material, when the preliminary issue in such a criminal trial is whether the material (book, magazine, film, etc.) is obscene under the law.[5] To that extent, though not specifically provided for by the statutory scheme, due process requires that a producer be made a party to the proceedings when the question is whether the material is obscene; the producer should be regarded as a party whose presence is indispensible and who must be given the opportunity to be heard before there can be any ruling of the court resolving the question of obscenity. The producer may intervene if he is not joined; his joinder could be had under the Long Arm Statute[6] if he is out of the state. By thus making an analogy to the civil procedure for purposes of those non-criminal issues affecting the producer, all issues will be disposed of at one hearing rather than piecemeal. Furthermore, it must be recognized that, unless the producer is among those prosecuted under the criminal statute, his role in the proceedings is not that of a criminal defendant; thus, the burden of proof questions to which the courts must address themselves will differ when some parties are criminal defendants and others are being affected in a non-criminal matter. In the case of the former, proof must be beyond a reasonable doubt; in the latter case, because the matter is civil in nature, the standard to be used is proof by a preponderance of the evidence. Any review of the ruling dealing with the issue of obscenity must be by this Court, as a major facet of the ruling below is criminal, and the hearing must be held before a district court exercising criminal jurisdiction. This not only serves judicial efficiency by preventing multiple litigation of the same question, but it provides a logical and cohesive handling of a proceeding which originates as a preliminary step in a criminal prosecution. Because the First Amendment rights of the producer are so inextricably bound in the determination made under R.S. 14:106(F)(1), he must always be given the opportunity to be heard by the Court before that determination can be made.
I agree with the principle expressed by the majority, that it is proper to treat a magazine as a discrete unit for purposes of applying the three-part test of R.S. 14:106(A)(3). However, I do not believe that either Manuel Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) or Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) are dispositive of the issue, as the majority would hold, since they make no definitive holding on the question. Federal jurisprudence since Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), as well as the jurisprudence of this state (e. g. State v. Luck, supra), does treat magazines as a unit for the purposes of applying the tests of obscenity, but no firm holding has been based upon this principle nor full exposition of the question made by either this Court or the Supreme Court of the United States. Other federal courts have dealt with the question at greater length, e. g. Penthouse *349 International, Ltd. v. McAuliffe, 610 F.2d 1353, 1366 (C.A. 5th Cir. 1980).[7]
In applying the section 106(A)(3) test to the issue of "Penthouse" here in question, I agree that it does not constitute obscenity because it fails to fit into the third part of the test which requires that "the work or thing taken as a whole lacks serious literary, artistic, political, or scientific value." I cannot say that this issue of the magazine does lack such value, when viewed as a whole; therefore, it cannot be considered obscene under the law of this state.
Though portions of this issue of the magazine do meet the tests for obscenity, when taking it as a whole, as I believe we must do, I cannot find it obscene.
Though contrary to the holdings of this Court and the United States Supreme Court, this writer regards restriction by government of what type of literature our citizens may or may not read as the most obscene element in the case.
NOTES
[1] The state objects to the intervention, correctly noting the absence of statutory provisions permitting intervention in a criminal case. Our obscenity statute purports to regulate otherwise constitutionally protected conduct. Standards and procedures otherwise unknown to Louisiana criminal law are found there. This court has in the past treated contested elements of the statute as if their validity depended only upon compliance with directives of United States Supreme Court cases interpreting the First Amendment. See State v. Luck, 353 So.2d 225, 235 (La.1977). Our statute requires an "adversary hearing" before an arrest can be made or a prosecution begun. No one is more interested nor better able to defend such a proceeding than the publisher, particularly, as here, the distributors did not oppose the state's efforts. The intervention is not improper.
[2] Expressions to the contrary in State v. Gambino, 362 So.2d 1107, 1111 (La.1978) are not correct, and to the extent it is in conflict with our opinion, the case is overruled.
[1] (1) Except for those motion pictures, printed materials, and photographic materials showing actual ultimate sexual acts or simulated or animated ultimate sexual acts when there is an explicit, close-up depiction of human genital organs so as to give the appearance of the consummation of ultimate sexual acts, no person, firm, or corporation shall be arrested, charged, or indicted for any violations of a provision of this Section until such time as the material involved has first been the subject of an adversary hearing under the provisions of this Section, wherein such person, firm, or corporation is made a defendant and, after such material is declared by the court to be obscene, such person, firm, or corporation continues to engage in the conduct prohibited by this Section. The sole issue at the hearing shall be whether the material is obscene.

(2) The hearing shall be held before the district court having jurisdiction over the proceedings within seventy-two hours after receipt of notice by the person, firm, or corporation. The person, firm, or corporation shall be given notice of the hearing by registered mail or by personal service on the owner, manager, or other person having a financial interest in the material; provided, if there is no such person on the premises, then notice may be given by personal service on any employee of the person, firm, or corporation on such premises. The notice shall state the nature of the violation, the date, place, and time of the hearing, and the right to present and cross-examine witnesses.
(3) The state or any defendant may appeal from a judgment. Such appeal shall not stay the judgment. Any defendant engaging in conduct prohibited by this Section subsequent to notice of the judgment, finding the material to be obscene, shall be subject to criminal prosecution notwithstanding the appeal from the judgment.
(4) No determination by the district court pursuant to this Section shall be of any force and effect outside the judicial district in which made and no such determination shall be res judicata in any proceeding in any other judicial district. In addition, evidence of any hearing held pursuant to this Section shall not be competent or admissible in any criminal action for the violation of any other Section of this Title; provided, however, that in any criminal action, charging the violation of any other Section of this Title, against any person, firm, or corporation that was a defendant in such hearing, involving the same material declared to be obscene under the provisions of this Section, then evidence of such hearing shall be competent and admissible as bearing on the issue of scienter only.
[2] Petition filed in court May 19, 1980. Intervention filed in court May 21, 1980.
[3] C.C.P. art. 1031, et seq.; 1091, et seq.
[4] For comparison, it should be noted that the federal case of Penthouse International, Ltd. v. McAuliffe (also titled Playboy Publications, Inc. v. McAuliffe), 610 F.2d 1354 (C.A. 5th Cir. 1980), is a civil case in which a number of publishers sued to enjoin action by a county solicitor general in Georgia. The plaintiffs complained that the actions of this prosecutor constituted impermissible prior restraint of their magazines and so violated the First, Fifth and Fourteenth Amendments of the U. S. Constitution. Plaintiffs sought injunctive relief against the prosecutor's actions (which consisted of such acts as arrests of distributors) which had the effect of causing significant economic loss to the publishers, who were affected even though they were not subject to the criminal prosecutions in the State of Georgia. Plaintiffs also sought declaratory relief as to the issue of obscenity of the publications in question. The Fifth Circuit overruled the decision of the district court as to the obscenity of the magazines, holding that two of the three in question were obscene. However, the court of appeal did uphold the court below and find that there was unconstitutional and impermissible prior restraint in the conduct of the solicitor general, and the district court's granting of injunctive relief was affirmed.
[5] Note that the question of whether a particular thing is found to be obscene is a question of law. State v. Luck, supra, at 230; see also William B. Lockhart and Robert C. McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 116 (1960).
[6] R.S. 13:3201, et seq.
[7] This test is derived from Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).