Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that plaintiff's motion to remand be and is granted.

IT IS FURTHER ORDERED that this action be and is remanded to the Circuit Court of the County of St. Louis, State of Missouri.

**UNITED STATES of America, Plaintiff,**

v.

**M–K ENTERPRISES, INC., and Lynn Sparks, Defendants.**

No. CR89–L–06.

United States District Court, D. Nebraska.

Sept. 11, 1989.

Alan L. Everett, Asst. U.S. Atty., Lincoln, Neb., for plaintiff.

Herbert J. Friedman, Lincoln, Neb., for M–K Enterprises, Inc.

William Taylor, Sioux Falls, S.D., and J. William Gallup, Omaha, Neb., for defendant Lynn Sparks.

## MEMORANDUM OF DECISION

URBOM, District Judge.

M–K Enterprises, Inc. and Lynn Sparks stood trial before the judge without a jury on July 10, 11, and 12, 1989. Each was charged with one count of conspiracy and four counts of using an express company and common carrier for carriage in interstate commerce of an obscene motion picture film on video tape in violation of 18 U.S.C. § 1462.

## ESSENTIAL ELEMENTS OF THE CHARGES

Count I of the indictment, charged under 18 U.S.C. § 371, has four essential elements as to each defendant, which are:

1. from on or about April 10, 1987, and continuing thereafter until on or about May 27, 1988, two or more persons reached an agreement or came to an understanding to knowingly use an express company or common carrier for carriage in interstate commerce of obscene motion picture films on video tapes;

2. the particular defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

3. at the time the particular defendant joined in the agreement or understanding, it or she knew the purpose of the agreement or understanding; and

4. while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the following acts for the purpose of carrying out or carrying forward the agreement or understanding:

a. on or about July 16, 1987, Dixie Murray, a/k/a Dixie Rea (hereinafter referred to as Dixie Murray) received from Jerry Lowe, a Lincoln, Nebraska, police officer working in an undercover capacity, an order for an obscene motion picture film on video tape entitled, "Marilyn Chambers' Private Fantasies # 5" and thereafter caused said order to be communicated to the defendants in the State of Iowa;

b. on or about September 14, 1987, the United Parcel Service delivered to the residence of Dixie Murray in Lincoln, Nebraska, the obscene motion picture film on video tape entitled "Marilyn Chambers' Private Fantasies # 5".

c. on or about September 19, 1987, Jerry Lowe purchased "Marilyn Chambers' Private Fantasies # 5" at the Embassy Theatre, Lincoln, Nebraska.

d. on or about September 2, 1987, the United Parcel Service delivered to the residence of Dixie Murray in Lincoln, Nebraska, an obscene motion picture film on video tape entitled, "Boys Camp Memories."

e. on or about September 11, 1987, Jerry Lowe purchased "Boys Camp Memories" at the Embassy Theatre, Lincoln, Nebraska.

f. on or about September 2, 1987, the United Parcel Service delivered to the residence of Dixie Murray in Lincoln, Nebraska, an obscene motion picture film on video tape entitled "S.F. Packing Co."

g. on or about September 21, 1987, Jerry Lowe purchased "S.F. Packing Co." at the Embassy Theatre, Lincoln, Nebraska.

h. on or about May 26, 1988, the United Parcel Service delivered to the residence of Dixie Murray in Lincoln, Nebraska, an obscene motion picture film on video tape entitled, "The Event."

i. on or about May 27, 1988, Jerry Lowe purchased "The Event" at the Embassy Theatre, Lincoln, Nebraska.

For me to find a defendant guilty of this crime the government must have proved all these essential elements beyond a reasonable doubt as to that defendant; otherwise, I must find that defendant not guilty.

The government must prove that the particular defendant reached an agreement or understanding with at least one other person. The "agreement or understanding" need not have been an expressed or formal agreement or in writing or covering all details of how it was to be carried out. Nor was it necessary that the members have directly stated between themselves the details or purpose of the scheme.

Merely being present at the scene of an event or merely acting in the same way as others or merely associating with others does not prove that a person has joined in an agreement or understanding. A person who has no knowledge of a conspiracy but who happens to act in a way that advances some purpose of one, does not thereby become a member.

A person may join in an agreement or understanding, as required by this element, without knowing all the details of the agreement or understanding, and without knowing who all the other members are. Further, it is not necessary that a person agree to play any particular part in carrying out the agreement or understanding. A person may become a member of a conspiracy even if that person agrees to play only a minor part in the conspiracy, as long as that person has an understanding of the unlawful nature of the plan and voluntarily and intentionally joins in it.

The substantive offenses the indictment alleges the conspiracy was formed to do are set out in Title 18, U.S.C. §§ 1462 and 1465.

The essential elements of the offense alleged under 18 U.S.C. § 1462 are:

1. knowingly using any express company or other common carrier

2. for carriage in interstate commerce

3. of any obscene, lewd, lascivious, or filthy motion picture film or other matter or indecent character.

The essential elements of the substantive offense described in 18 U.S.C. § 1465 are:

1. knowingly transporting in interstate commerce

2. for purpose of sale or distribution

3. any obscene motion picture film.

The crime alleged in Count II of the indictment has four essential elements, which are:

1. a particular defendant on or about September 14, 1987, knowingly used an express company or other common carrier;

2. such use was for carriage in interstate commerce of a motion picture film on video tape entitled "Marilyn Chambers' Private Fantasies # 5";

3. that motion picture film was obscene; and

4. that use was committed and carried out in the course of and furtherance of the conspiracy set forth in Count I, while the particular defendant was a member of the conspiracy.

The crime alleged in Count III of the indictment has four essential elements, which are:

1. the particular defendant on or about September 2, 1987, knowingly used an express company or other common carrier;

2. such use was for carriage in interstate commerce of a motion picture film on video tape entitled "Boys Camp Memories";

3. that motion picture film was obscene; and

4. that use was committed and carried out in the course of and furtherance of the conspiracy set forth in Count I, while the particular defendant was a member of the conspiracy.

The crime alleged in Count IV of the indictment has four essential elements, which are:

1. a particular defendant on or about September 2, 1987, knowingly used an express company or other common carrier;

2. such use was for carriage in interstate commerce of a motion picture film on video tape entitled "S.F. Packing Co.";

3. that motion picture film was obscene; and

4. that use was committed and carried out in the course of and furtherance of the conspiracy set forth in Count I, while the particular defendant was a member of the conspiracy.

The crime alleged in Count V of the indictment has four essential elements, which are:

1. a particular defendant on or about May 26, 1988, knowingly used an express company or other common carrier;

2. such use was for carriage in interstate commerce of a motion picture film on video tape entitled "The Event";

3. that motion picture film was obscene; and

4. that use was committed and carried out in the course of and furtherance of the conspiracy set forth in Count I, while the particular defendant was a member of the conspiracy.

Each of the defendants is presumed to be innocent. Thus each defendant, even though charged, begins the trial with no evidence against it or her. Presumption of innocence alone is sufficient to find a defendant not guilty and can be overcome only if the government proves, beyond a reasonable doubt, each essential element of the crime charged. There is no burden upon a defendant to prove that it or she is innocent and the fact that the defendant did not testify must not be considered by me in any way in arriving at my verdict.

### FINDING FROM THE EVIDENCE—COUNT I

From at least January 1, 1987, until May 27, 1988, Lynn Sparks was president of M–K Enterprises, Inc. She resided in Des Moines, Iowa, which was also the principal place of operation of M–K Enterprises, Inc. Sparks on behalf of M–K Enterprises, Inc. took an active part in the operations of the corporation, including the Embassy Theatre in Lincoln, Nebraska. Dixie Murray, a/k/a Dixie Rea (hereafter referred to as Dixie Murray) was the manager throughout that period of the Embassy

Theatre. The theatre regularly showed movies to live audiences and had for sale sexually explicit magazines and novelty items such as vibrators and dildoes and for sale or rent sexually explicit video tapes. Most of the sexually explicit video tapes were sent from M–K Enterprises, Inc. in Des Moines, Iowa, to the residence of Dixie Murray in Lincoln, Nebraska, by United Parcel Post, a common carrier. Typically, Murray would order the tapes through Sparks or another employee of M–K Enterprises, Inc. and that person would cause them to be sent by U.P.S. to Murray's address in Lincoln. Murray would then take them to the Embassy Theatre and hold them for sale and rental. Materials other than what Dixie Murray referred to as the "hard core, adult stuff" was received at the Embassy Theatre directly; only the "hard core, adult stuff" went to her residence. Sparks frequently went to Lincoln, Nebraska, to attend to the business of the Embassy Theatre and searching for other real estate in which to establish another outlet for sexually explicit video tapes. Each of the defendants knew the general nature and character of the video tapes being rented and sold at the Embassy Theatre.

Some of the video tapes were obscene, as I shall explain later. The defendants knew the nature of them, even though there is not evidence that Sparks had seen any of the tapes that are specifically charged in this indictment. She personally made the decision to get and ship to Lincoln "Marilyn Chambers' Private Fantasies # 5."

I find beyond a reasonable doubt that:

1. on or about April 10, 1987, and continuing thereafter until after May 27, 1988, Lynn Sparks, Dixie Murray, and M–K Enterprises, Inc. reached an agreement or came to an understanding to knowingly use United Parcel Service, a common carrier, for carriage in interstate commerce of obscene motion picture films on video tapes;

2. M–K Enterprises, Inc. and Lynn Sparks voluntarily and intentionally joined in the agreement or under-

standing at the time it was first reached or at some time later while it was still in effect;

3. at the time M–K Enterprises, Inc. and Lynn Sparks joined in the agreement or understanding each of them knew the purpose of the agreement or understanding; and

4. while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did each of the following acts:

a. on July 16, 1987, Dixie Murray received from Jerry Lowe, a Lincoln, Nebraska, police officer working in an undercover capacity, an order for a motion picture film on video tape entitled, "Marilyn Chambers' Private Fantasies # 5," and thereafter caused that order to be communicated to Lynn Sparks and M–K Enterprises, Inc. in Des Moines, Iowa;

b. on either September 14, 1987, or September 17, 1987, United Parcel Service delivered to the residence of Dixie Murray at 917 Washington Street, Lincoln, Nebraska, the motion picture film on video tape entitled "Marilyn Chambers' Private Fantasies # 5;"

c. on September 19, 1987, Jerry Lowe purchased "Marilyn Chambers' Private Fantasies # 5 at the Embassy Theatre, Lincoln, Nebraska;

d. the motion picture film on video tape entitled, "Marilyn Chambers' Private Fantasies # 5," was obscene;

e. each of the events set out in paragraphs a through d was in furtherance of the above-mentioned agreement or understanding while each of the defendants was a member of the conspiracy.

### FINDINGS FROM THE EVIDENCE— COUNT II

The motion picture film on video tape entitled "Marilyn Chambers' Private Fantasies # 5" was purchased by Jerry Lowe at the Embassy Theatre, Lincoln, Nebraska, on September 19, 1987. It had been delivered by United Parcel Service to Dixie Murray's residence on either Septem-

ber 14 or September 17, 1987, (the date on the delivery ticket is unclear as to whether it was the 14th or the 17th). It had been requested by Lowe of Murray as early as July 16, 1987, and Lowe and Murray had talked about it on more than one occasion between that date and Lowe's purchase of it. Murray asked Sparks about it and Sparks checked on it and caused it to be sent to Murray's residence by United Parcel Service. Murray took it from her residence to Embassy Theatre and it was sold there to Lowe. Sparks' and Murray's actions were on behalf of M–K Enterprises, Inc.

The video tape, "Marilyn Chambers' Private Fantasies # 5," plaintiff's Exhibit 21, is in four distinct segments, each featuring Marilyn Chambers, but none having any particular connection with the other. One segment shows Marilyn Chambers handcuffed through most of the episode, the impression for the most part being that she is not participating in the explicit sexual activity voluntarily. Cunnilingus, vaginal intercourse, anal intercourse, fellatio, and intercourse by a male police officer's nightstick in Chambers' vagina all occur. The two males, portraying police officers, use demeaning language to and about her. A message of the segment appears to be that force in sexual activity is acceptable and that sexual domination of one woman by two men is enjoyment to the woman. Rape and murder "turn me on," she announced in the prelude.

The second segment of Exhibit 21 stars Marilyn Chambers and Tantala in lesbian activity with some show of "pain" from the striking of the vagina and breasts, the declared lesson to be that pain, properly administered, is "really pleasure."

The third segment shows Marilyn Chambers being interviewed by a disc jockey who has fantasized the interviewing of a naked woman. Chambers wants her record to be played on radio stations. She removes her blouse and, while being interviewed, performs fellatio on him and leaves him with a statement that she would "finish you off" when her record is a hit across the country.

The fourth segment is of a bachelor party crashed at the groom's invitation by Marilyn Chambers. Two men at the bachelor party, Marilyn Chambers, and later the bride, Marilyn Chambers and the groom perform fellatio, intercourse, and cunnilingus.

The determination of whether material is obscene is to be made under the test in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973):

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest ... (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

The same test is applicable to federal cases, according to *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). That case said:

"The result of the *Miller* case, therefore, as a matter of constitutional law and federal statutory construction, is to permit a juror sitting in obscenity cases to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion 'the average person, applying contemporary community standards' would reach in a given case. Since this case was tried in the Southern District of California, and presumably jurors from throughout that judicial district were available to serve on the panel which tried petitioners, it would be the standards of that 'community' upon which the jurors would draw. But this is not to say that a district court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jurors in the resolution of the issues which they were to decide."

*Id.* 418 U.S. at 105–106, 94 S.Ct. at 2901–2902.

Whether material, applying contemporary community standards by the average person "appeals to the prurient interest," is determined, not by "whether or not the viewer is sexually excited by the challenged materials," as asserted by the defendants in their reply brief, but by whether the intent of the material is to arouse the prurient interest of a viewer. In *Pinkus v. United States*, 436 U.S. 293, 302, 98 S.Ct. 1808, 1814, 56 L.Ed.2d 293 (1978),

> "Examination of some of the materials could lead to the reasonable conclusion that their prurient appeal would be more acute to persons of deviant persuasions, but it is equally clear that they were intended to arouse the prurient interest of any reader or observer...."

At 303–304, 98 S.Ct. at 1814–1815 the court said:

> "... [The instruction] permitted the jury to consider the touting descriptions along with the materials themselves to determine whether they were intended to appeal to the recipient's prurient interest in sex.... [T]he evidence was sufficient to trigger the ... pandering instruction."

I am not persuaded that "prurient interest" must involve compulsiveness or shamefulness, as thought by defendants' expert, Dr. Daniel Patrick Murphy. I think it includes the concept of a strong desire or craving for sex, but not necessarily compulsiveness or inability to control one's self. Dr. Murphy thought it embodies shamefulness; I think it is more revealing of shamelessness. While he thought a film to be obscene must tend to produce a sense of guilt, I think it must tend to be attractive to that interest that knows no sense of guilt, but holds instead a brazen lack of shame. Dr. Murphy spoke of a morbid interest in sex; I agree that obscenity entails an element of unwholesomeness and relates to the coarser aspects of sexual activity. Is the video tape intended to cause the viewer to experience a shameless craving for the coarser features of sex? "Marilyn Chambers' Private Fantasies # 5" is so intended.

Applying the *Miller* test under contemporary community standards, by which I mean in this case the 1987–1988 standards of southeast Nebraska—the segment of the state from which jurors are summoned when cases are tried in this court to a jury—I think the average person would conclude that "Marilyn Chambers' Private Fantasies # 5," taken as a whole, appeals to the prurient interest.

The second prong of the *Miller* test is "whether the work depicts or describes, in a patently offensive way, sexual conduct." It clearly does. Depicting involuntary intercourse, cunnilingus and fellatio, massaging the vagina with a nightstick, pretending that rape is pleasurable to the woman, calling a woman "bitch," portraying pain as pleasure, striking the vagina and breasts with a whip, giving an enema during sexual encounter, smearing semen onto the woman's body, simultaneous fellatio and vaginal or anal intercourse, and simultaneous cunnilingus and fellatio make the presentation patently offensive.

The third prong is "whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value." It lacks all of them. There is absolutely nothing of a serious literary, artistic, political or scientific value to any segment of the tape.

I find each of the defendants guilty of Count II.

### FINDINGS FROM THE EVIDENCE— COUNT III

■ The video tape entitled, "Boys Camp Memories," was rented by Jerry Lowe on September 11, 1987. It had arrived at the Embassy Theatre in Lincoln, Nebraska, about a week earlier than that. Its mode of arrival is uncertain from the evidence. I cannot say beyond a reasonable doubt that it came by United Parcel Service or any other express company or common carrier. Accordingly, I must find the defendants not guilty of Count III.

### FINDINGS FROM THE EVIDENCE— COUNT IV

"S.F. Packing Co.," a motion picture film on video tape, was rented by Jerry Lowe, using the name John Fowler, at the Embas-

sy Theatre on September 11, 1987. He purchased it at the Embassy Theatre on September 21, 1987. He thinks he saw it removed from a box by an Embassy Theatre employee on that date and believes that the same box was later obtained by another officer, which is addressed to Dixie Murray, 917 Washington, Apartment # 1, Lincoln, Nebraska 68502 (plaintiff's Exhibit 32). Upon careful examination of the evidence, I cannot find beyond a reasonable doubt that "S.F. Packing Co." was transported in interstate commerce by an express company or common carrier. Not all the explicit sexual material was delivered by way of express company or common carrier; some was brought from time to time by Sparks or another employee of M–K Enterprises, Inc. I grant that there is no satisfying evidence that this video tape was brought by any of them; suffice it to say, however, that the evidence does not show beyond a reasonable doubt that it came by express company or common carrier, either.

Accordingly, I must find each of the defendants not guilty of Count IV.

### FINDINGS FROM THE EVIDENCE— COUNT V

■ The video tape charged under Count V is "The Event." It was purchased by Jerry Lowe at the Embassy Theatre on May 27, 1988. It arrived in Lincoln at the residence of Murray, 2120 J, Apartment 3, on May 26, 1988, after having been picked up by United Parcel Service in Des Moines, Iowa, for delivery to Murray. It was sent from M–K Enterprises, Inc. in Des Moines, Iowa, to Lincoln, Nebraska, for resale in furtherance of the conspiracy set forth in Count I while each of the defendants was a member of that conspiracy.

The foregoing was established beyond a reasonable doubt.

"The Event" is in five parts, the first showing a man and a woman performing fellatio, the second showing two women making love to each other through cunnilingus, the third showing two men having intercourse with each other and with a woman and she performing fellatio, the fourth showing two men kissing, performing fellatio, and ejaculating, and the fifth showing two men and women performing intercourse.

I have considered the tape as a whole according to my understanding of the contemporary community standards of the average person in southeast Nebraska. "The Event" is a simple film. It is unbridled sex, the eager, unabashed, no-holds-barred doing of raw sex—oral, manual, vaginal, anal, heterosexual and homosexual—in multiple positions and in wearisome repetition. It is a crude expression of a primitive passion, exaggerated by patently offensive full-screen close-ups of the sex parts in action. That is what it is, nothing more and nothing less.

There is no force, no deliberate pain, no inanimate insertions, no bondage, no involvement of children or animals and no deception.

If a video tape, to be legally obscene, must be designed to be attractive to an urge for a darker side of sex—the morbid, sick, unhealthy, unwholesome side—as I think it must, then I have a reasonable doubt that this one is.

Despite the tape's offensiveness, it is not legally obscene beyond a reasonable doubt and the defendants, therefore, must be found not guilty of the offense charged in Count V.

### JUDGMENT

In accordance with the memorandum of decision of today,

IT IS ORDERED that the defendant M–K Enterprises, Inc. and the defendant Lynn Sparks are found guilty of the charge in Count I and the charge in II of the indictment and are found not guilty of the charges in Counts III, IV and V of the indictment.

IT IS FURTHER ORDERED that the sentencing is set for November 30, 1989, at 12:15 p.m.; the procedure for preparation and presentation of the presentence report

will be in accordance with the order of this court dated February 16, 1989.