Gareth REES, Appellant,

v.

The STATE of Texas, Appellee.

Terrel Denise JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 03–94–00290–CR, 03–94–00291–CR.

Court of Appeals of Texas,
Austin.

Oct. 18, 1995.

Rehearing Overruled Nov. 15, 1995.

Peter D. Kennedy, George, Donaldson & Ford, L.L.P., Austin, for appellants.

Ken Oden, County Attorney, Giselle Horton, Assistant County Attorney, Austin, for appellee.

Before POWERS, ABOUSSIE and DALLY,* JJ.

CARL E.F. DALLY, Justice (Retired).

A jury convicted appellants Gareth Rees and Terrel Denise Johnson of the offense of promotion of obscenity. Tex. Penal Code Ann. § 43.23(c) (West 1994).[1] The trial court

---

* Before Carl E.F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1988).

1. This offense took place before September 1, 1994, and is governed by the law in effect at the time the offense was committed. Penal Code, 73rd Leg., R.S., ch. 900, § 1.18, 1993 Tex.Gen. Laws 3586, 3705. Because the code amendments effective September 1, 1994, have no substantive effect on this offense, the current code is cited for the sake of convenience.

assessed each appellant's punishment at confinement in the county jail for one hundred eighty days and a fine of $2,000.00, probated for one year. The jury acquitted appellants of charges of harmful display of obscene material to minors. The charges against appellants were joined for trial before the same jury, and on appeal, appellants filed a consolidated brief. Three points of error challenge the sufficiency of the evidence, and three points of error complain of the court's jury charge. We will affirm the judgments of the trial court.

*Infosex*, a live call-in program produced by appellant Johnson and hosted by appellant Rees was telecast for several months on an Austin Community Television Cable access channel. During the *Infosex* program aired on August 23, 1993, between 12:00 a.m. and 2:00 a.m., appellants exhibited a film called *Midnight Snack*. The showing of *Midnight Snack* resulted in charges against and convictions of appellants. The indictments in pertinent part allege appellants

> knowing the content and character of certain material was obscene, to-wit: One (1) video tape depicting a man with the penis of another man in his mouth, a man placing his finger in the anus of another, a man licking with his tongue the anus of another and two men masturbating each other, did then and there promote said material by transmitting, exhibiting, disseminating and present said video tape during a broadcast on an Austin Cablevision channel.

The indictments charging appellants with promoting obscene material describe the acts depicted in the film *Midnight Snack*. Jury instructions tracked the indictments authorizing appellants' conviction for promoting the acts portrayed in the film *Midnight Snack*. Appellants assert that the film *Midnight Snack* was an integral part of the *Infosex* program and that because the State did not even attempt to prove that the entire *Infosex* program was obscene the evidence does not support appellants' convictions. On the other hand, throughout the prosecution and now on appeal, the State insists that it need not prove that the entire *Infosex* program was obscene but need prove only that the film *Midnight Snack* was obscene.

Therefore, we must decide whether the film *Midnight Snack* may alone and separately be considered in determining if appellants promoted obscene material. We will first address appellants' fourth point of error in which they assert the trial court erred in failing to instruct the jury to consider the *Infosex* program as a whole.

Although they were acquitted, appellants had been charged with and were on trial for the harmful display of obscene matter to minors. To prove these charges, the State offered the testimony of a minor and expert testimony. Also, in an apparent attempt to show circumstantially that some of the callers and viewers were minors, the State offered in evidence not only the film *Midnight Snack* but the entire tape of the *Infosex* program.

The *Infosex* program starts with an introductory film clip of a "shower scene" in which the sole actor is appellant Rees. Rees is nude with his back to the camera, legs spread and his scrotum visible. Rees caresses his body, saying he loves his body, and slowly turns until he presents a fully nude frontal view. He fondles his testicles and penis and expresses a belief that he is about to ejaculate. Rees testified that he showed the shower scene as an introduction to the *Infosex* programs to gauge viewers' reactions. During the program, viewers called in with comments on the shower scene.

After this introduction, Rees conducts the *Infosex* program in a bare studio while sitting several feet above the floor on the top steps of a moveable stair unit. Rees is wearing a robe which he tells the television audience is a gift from his lover. He points out that the robe allows glimpses of his underwear. During a part of the program, Rees holds a toy panda bear. Rees informs his audience that he is homosexual and H.I.V. positive.

While Rees is fielding calls, some callers direct hateful and offensive language toward Rees and his stated lifestyle. One caller carries on a long conversation saying he is homosexual and H.I.V. positive, describing his symptoms and condition; he then ends his call reviling Rees with abusive language. Rees acknowledges that he was fooled by the

caller's hoax. In one call, a man claims he is H.I.V. positive and asks about the transmission of the virus and safe-sex techniques. Rees tells him that H.I.V. can be transmitted through oral sex and that you need to make sure you wear a condom. Rees verbally describes a "dental dam," how to make one from a condom, and says that it should be used when performing oral sex on a woman, or "rimming" a man (anilingus). Rees tells the caller, "I don't want you to feel you have to give up your sex life just because you are H.I.V. positive. You will just have to look at sex in a different way."

Rees discusses sexually transmitted diseases and the transmission rates among different population groups. He discusses and disapproves of the "tea room" practice among some gay men. Many of the callers do not talk about Rees' announced theme of the program, sexual fantasies. Some callers' voices sound young, and Rees, apparently perceiving them to be children, cuts them off telling them they should be in bed.

During the second hour of his *Infosex* program, Rees says he is ready to show a film produced by the New York organization, Gay Men's Health Crisis. He says it is primarily for gay men, but he promises that he will in future programs show explicit films for his heterosexual audience. Rees introduces the film:

Now, there's this little clip that I'm going to show you, and sex is not just limited to, to the bedroom, okay? And, like, we all know in our fantasies, you know, when we fantasize, we can probably fantasize about having sex on the beach, or in the car, or outside in your backyard, for instance. Um, and of course, if you have a big apartment or a big house, there's the kitchen, there's the living room, there's the dining room, there's the shower, so, um, sex is not just confined to the bathroom or to the— excuse me—to the bedroom. So what you want to do, or what you want to see in this tape, is, um,—it's a little kitchen scene, and, um, not only does the kitchen offer you, like, the countertop or the table, you know, to have sex on, but also the refrigerator, there's lots of goodies that you can use to enhance your sex life. Then again

you could take these goodies in a picnic basket and go outside somewhere, um, in a wheat field, a corn field, and lay out a blanket and just have sex out there and, and take out, you know, the marshmallow cream, or, you know, the, the chocolate sauce, and, you know, rub it around your body and, you know, enjoy licking your partner at the same time while enhancing your taste buds.

The film *Midnight Snack* is then exhibited to the television audience. It shows a kitchen scene with two nude adult males. There is no dialogue. One man is leaning forward resting his upper torso on a table, and the other man engages in anilingus. Following this, the pair embrace kissing each other. The camera then focuses on the pair's erect penises while they masturbate each other. Next, the couple performs fellatio with whipped cream applied to one man's penis and a condom drizzled with honey is placed on the other man's penis. After the showing of *Midnight Snack*, Rees makes a few comments, fields several calls and the program ends.

Appellants argue vigorously that the purpose of the *Infosex* program was to promote safe sexual practices and that *Midnight Snack* was an integral part of the program. Appellants offered extensive expert testimony in support of their theory of the case. Rees stated on the program that abstinence from sex, except in monogamous relationships, was desirable, but unlikely. Therefore, appellants' purported message was that the practice of "safe-sex" is fun and prevents the spread of AIDS.

The Supreme Court has defined obscenity:

[W]e now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin, supra* [408 U.S. 229] at 230 [92 S.Ct. 2245, 2246], 33 L.Ed.2d 312 [ (1972) ], quoting *Roth v. United States, supra,* [354 U.S. 476] at 489 [77 S.Ct. 1304, 1311], 1 L.Ed.2d 1498 [ (1957) ]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the *"utterly* without redeeming social value" test of *Memoirs v. Massachusetts,* 383 U.S. [413] at 419 [86 S.Ct. 975, 977], 16 L.Ed.2d 1[ (1966) ].

*Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). While the Supreme Court has not further defined the phrase "work, taken as a whole" used in *Miller,* the Supreme Court and other courts have applied the phrase in various situations, but its application remains uncertain and difficult:

> Although I am in full agreement with Judge Thornberry's analysis of existing precedent relating to application of the "taken as a whole" test to magazines, I write further only to observe that this rule of law in its present state of development creates needless uncertainty for everyone involved.

> In its first two tests, *Miller* (i) adopts a community's standard of prurience and (ii) permits the community to codify specific bans on sexual conduct. An over broad interpretation of whether, "taken as a whole," a publication as loosely structured as these magazines lacks serious literary, artistic, political or scientific value could deny all meaning to those standards of morality and decency. How then is this third test to be applied? Should it weigh the good against the bad, *i.e.,* does one brilliant article on the arts outweigh explicit pictures of a couple copulating, or does one series of pictures portraying the rape and mutilation of a child outweigh two

average articles on politics or science? When the materials are totally independent of every other portion of the publication except through a claimed appeal to some interest of the magazine's expected audience, I submit that segment ought to be separately appraised. If it is totally independent, it ought not be carried, Typhoid Mary-like, into a community by other articles which shows serious merit. Ipse dixit judicial pronouncements on the value of an individual magazine "as a whole" are no more helpful than the "I know it when I see it" approach. Until the court permits separate appraisal of each discrete segment of the hodge-podge, publishers, community, policeman, and judge will have to continue to wonder what the drum says.

*Penthouse International Ltd. v. McAuliffe,* 610 F.2d 1353, 1373–74 (5th Cir.1980) (Clark, Circuit Judge, concurring).

The State argues that the work that is to be taken as a whole should be measured in thematic units. In other words, works or materials that are not related or united by a theme should not be taken as a whole. As one commentator put it:

> The New York courts have followed the approach of evaluating each story or article separately. "If any single item [in a magazine] considered as a whole, were pornographic, the circumstances that it was included in a collection otherwise without taint would not save it from criminal prosecution." But it has also been suggested that, in general, the entire "physical item," that is, book, magazine, or other item, be looked at as a unit. If the "physical item" test were rigidly applied, however, it would be far too easy to include hardcore pornography as one article in a magazine also containing excerpts from the writings of D.H. Lawrence or James Joyce.

Frederick F. Schauer, *The Law of Obscenity,* p. 108–9, Bureau of National Affairs, Inc. 1976.

The opinion in *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972) indicates that the work to be taken as a

whole should be measured in thematic units and not in physical units. In *Kois*, an underground newspaper carried an article about an obscenity prosecution accompanied by two small pictures of embracing nudes. These pictures were said to be similar to those pictures which were the subject of the prosecution discussed in the article. The court did not decide whether the pictures alone were obscene or whether the newspaper in its entirety must be considered because the article and the pictures were rationally related. The pictures and the accompanying article were taken as a whole because they were thematically related. In *Flying Eagle Publications v. United States*, 285 F.2d 307, 308 (1st Cir.1961), the prosecution was for mailing obscene matter. The defendant complained of the trial court's refusal to instruct the jury that in determining whether an alleged obscene illustration was obscene it must consider the accompanying article taking them as a whole. The court rejected defendant's contention, stating:

> [A] jury is not compelled to regard illustrations as controlled by textual material. An obscene picture of a Roman orgy would be no less so because accompanied by an account of a Sunday school picnic which omitted the offensive details. Nor is the principle different merely because these details might not be readily apparent to everyone upon a casual inspection.

In *United States v. Merrill*, 746 F.2d 458 (9th Cir.1984), the court used a thematic test. The defendant mailed letters which admittedly bore a constitutionally protected message, and attached to the letters were two playing cards depicting adults engaged in oral sex. *Id.* at 464. The government did not attempt to prove that the letters, taken as a whole, lacked serious literary, artistic, political, or scientific value. *Id.* at 464. The court found that the pornographic playing cards were not a part of the theme and not a part of the message. The attached nonintegrated playing cards could be found to make the whole letter a sham political statement. *Id.* at 464.

In *Goocher v. State*, 633 S.W.2d 860 (Tex. Crim.App.1982), Judge Clinton used the term "unit of perception," applying a "thematic unit" concept in deciding whether films were obscene. The defendant was prosecuted for exhibiting two allegedly obscene films. The defendant contended that because the deputy sheriff paid a single admission for a program in which three films were shown, the jury should have been required to consider all three films in deciding whether the program as a whole was obscene. The court rejected Goocher's contention holding that the State properly exercised its right not to charge Goocher with exhibiting the third film in the program.

*Infosex* was a live, unrehearsed, loosely structured call-in program, a part of which had not yet been created when the film *Midnight Snack* was exhibited. The announced theme of the program was not followed. *Midnight Snack* was a film produced by parties other than appellants long before the program *Infosex* was produced. The *Infosex* video exhibited to the jury was filmed while the program was in progress. Moreover, although the State did not choose to prosecute appellants for the exhibition and promotion of the "shower scene" film shown at the beginning of the *Infosex* program, it, too, may be considered a separate "unit of perception" for which appellants could have been prosecuted. The *Infosex* call-in program was a sham, a pretense, for the promotion of both the "shower scene" film and the *Midnight Snack* film. Despite appellants' argument, we conclude that the *Infosex* program was a vehicle used to promote and exhibit *Midnight Snack*. *Midnight Snack* was a separate unit of perception. *See Merrill*, 746 F.2d at 464; *Goocher*, 633 S.W.2d at 863. As the trial court properly charged the jury, *Midnight Snack* is by itself the "work, taken as a whole." Appellants' fourth point of error is overruled.

■ In their first two points of error, appellants urge that the State failed to prove that the *Infosex* program was obscene and that viewed as a whole it lacked serious value. Thereby, arguing that the evidence is insufficient to support their convictions. Because we have decided that appellants could be properly prosecuted for promoting the film *Midnight Snack* alone and apart from the *Infosex* program, the State had no burden to prove the *entire* program *Infosex* was

obscene and as a whole lacked serious value. We will overrule appellants' first two points of error. However, we will discuss appellants' argument as it might apply to the promotion of *Midnight Snack.*

██ Appellants fault the State for failing to provide expert testimony that the material is obscene. The film of the entire *Infosex* program is in evidence. The film *Midnight Snack* shown on the program is in evidence. This evidence was before the jury and the trial court and it is before this court for our inspection and consideration; therefore, expert testimony is not required. *Hamling v. United States,* 418 U.S. 87, 100, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); *Paris Adult Theatre 1 v. Slaton,* 413 U.S. 49, 56, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Coon v. State,* 871 S.W.2d 284, 289 (Tex.App.—Fort Worth 1994, pet. ref'd). In cases involving hardcore pornography, the trier of fact needs no expert advice. *United States v. Young,* 465 F.2d 1096, 1099 (9th Cir.1972); *United States v. Wild,* 422 F.2d 34 (2d Cir.1969).

Texas statutory provisions are fashioned after the guidelines enunciated in *Miller. Coon,* 871 S.W.2d at 287. A person commits an offense if, knowing its content and character, he promotes or possesses with the intent to promote any obscene material. Tex. Penal Code Ann. § 43.23(c). The Texas Penal Code defines obscene:

(1) "Obscene" means material or a performance that:

(A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(B) depicts or describes:

(i) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and

(C) taken as a whole, lacks serious literary, artistic, political, and scientific value.

(2) "Material" means anything tangible that is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound, or in any other manner, but does not include an actual three dimensional obscene device.

(3) "Performance" means a play, motion picture, dance, or other exhibition performed before an audience.

(4) "Patently offensive" means so offensive on its face as to affront current community standards of decency.

(5) "Promote" means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise, or to offer or agree to do the same.

Tex. Penal Code Ann. § 43.21 (West 1994).

██ The jury, properly instructed, found that the material promoted in *Midnight Snack* was obscene. Implicit in the trial court's rulings is an independent finding that the material promoted in *Midnight Snack* is obscene. In determining whether material is constitutionally obscene, appellate courts are obliged to independently review and evaluate the material. This we have done applying the test of *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). *See also Andrews v. State,* 652 S.W.2d 370, 383 (Tex.Crim.App.1983). We have viewed the entire *Infosex* program, including the film *Midnight Snack.* In our review of the findings of the jury and trial judge, applying *Miller's* test, we find the evidence sufficient to support the jury's verdict and the trial court's finding that *Midnight Snack* is obscene. Applying *Miller's* dictates, we independently find that *Midnight Snack,* taken as a whole, lacks serious literary, artistic, political, or scientific value.

Its graphic, explicit depiction of two males engaged in acts of anilingus, fellatio, and mutual masturbation constitutes hard-core pornography that is unprotected by the First Amendment. *See Davis v. State,* 658 S.W.2d 572, 578 (Tex.Crim.App.1983). Appellants' first two points of error are overruled.

In point of error three, appellants assert that the State failed to prove beyond a reasonable doubt that appellants knew the *Infosex* program was obscene. We have held that appellants were properly prosecuted for showing the film *Midnight Snack* by itself; it was unnecessary for the State to prove that the appellants knew the entire *Infosex* program was obscene. We will therefore overrule this point of error. Nevertheless, we will discuss appellants' argument in this point of error as it might apply to the film *Midnight Snack.*

 As a matter of law, it is only necessary for the State to prove that appellants knew the content and character of the film. It was as a matter of law unnecessary to allege and prove that appellants knew the film was obscene. Tex. Penal Code Ann. § 43.23 (West 1994). *See Hamling,* 418 U.S. at 120–21, 94 S.Ct. at 2909. However, the State needlessly added to its burden of proof by alleging that appellants not only knew the nature and character of the material, but also that appellants knew the material was obscene. More importantly, the State without objection allowed the trial court to instruct the jury that to find appellants guilty they must find that appellants knew the material was obscene.

Although the record contains evidence that neither appellant believes that *Midnight Snack* is obscene, there is ample evidence in conflict with their stated beliefs for the jury to have found beyond a reasonable doubt that appellants knew *Midnight Snack* was obscene. First, there is evidence that appellants knew the content and character of the film *Midnight Snack* before it was shown on the Infosex program. Second, not only is there a presumption that appellants knew the law of obscenity, there is affirmative evidence that appellants knew the law of obscenity.

Johnson's grand jury testimony, which was admitted in evidence, shows appellants previewed *Midnight Snack* and were aware of its content and character before it was shown. Rees' quoted narration immediately before the showing of *Midnight Snack* shows not only an awareness and understanding of the film's nature and character but also a knowledge of the film's prurient nature. Before showing the film, Rees also said, "This one is gay related but you can still learn from it. There's going to be an example of rimming and that is oral contact with the anus." Rees told his television audience and also testified that his "source" of the film *Midnight Snack* was "Rick X." He also testified during direct examination that he thought the film *Midnight Snack* had been shown to other audiences in the United States. On cross-examination Rees testified that someone whom he assumed was "Rick X" filed a lawsuit in New York City in an attempt to force public access television stations to broadcast *Midnight Snack.* A voice heard on the *Midnight Snack* tape preceding the action states that the anilingus scenes,

did not bother Manhattan cable because there was no masturbation or insertion, so it didn't fit anything on their list. However, the following portion which involves fellatio and masturbation using a condom was basically off limits so they sent this one back, too.

It may be inferred that the New York City stations would not show the film because it was obscene under New York law. Appellants were aware of the controversy in New York City. Immediately following the showing of *Midnight Snack,* Rees, speaking to the viewing audience referred to the film as explicit, and expressed the hope that those persons who had seen the film could "be mature" about it. Although appellants were not charged with promoting the "shower scene" film, that film was in evidence, and the jury could use that evidence to aid in its determination that appellants had knowledge that *Midnight Snack* was obscene.

Johnson warranted in writing to the cable system that the *Infosex* program did not contain "any material that violates local, state or federal law relating to obscenity" or that

was "contrary to local, state, and federal laws." She also acknowledged in writing that she was aware that federal law provides penalties of fines and imprisonment for transmitting obscene matter over any television cable system. To make these statements true, Johnson had to know the law of obscenity. Rees testified that he had seen a documentary film in October 1992, by which he learned the law governing obscenity. Appellants knew that the statute provides that material is obscene which depicts or describes patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sodomy, masturbation, lewd exhibition of the genitals or the male genitals in a state of sexual stimulation or arousal. The evidence shows that appellants knew the content and character of the film, *Midnight Snack*, and that they knew the law of obscenity. We conclude that the evidence supports the jury's finding that appellants knew the acts depicted in *Midnight Snack* were obscene beyond a reasonable doubt, and that the State proved the unnecessarily assumed burden that appellants knew *Midnight Snack* was obscene beyond a reasonable doubt. Appellants' third point of error is overruled.

■ In their fifth point of error, appellants argue that the jury charge improperly failed to instruct the jury that it must find the program lacked serious educational value before it could find it obscene. Appellants say their defense was largely based on their claim that the *Infosex* program and the film *Midnight Snack* had educational value. They maintain the jury instructions left the jury free to conclude that if appellants' program did not rise to the level of "serious science" it could be judged obscene, even if the jury believed the program had serious educational value. Because the appellants' objections to the charge encompassed the entire *Infosex* program and was not limited to *Midnight Snack*, the objection was too broad and did not preserve the claimed error for review. However, the trial court properly instructed the jury in accord with the statute, Tex. Penal Code Ann. § 43.21, and as required by *Miller v. California.*

In *United States v. One Reel of Film*, 481 F.2d 206, 210 (1st Cir.1973), an argument advanced by the defendant, supported by expert testimony, urged that the film *Deep Throat* had educational value. There the court said:

> The difficulty is that the argument proves too much. We are told by the Supreme Court that obscene material is unprotected by the First Amendment, such material being described as confined to "works which depict or describe sexual conduct." We can only read the recent cases as an express rejection of any argument that pornography itself, because of its liberating impact, has for that reason alone, serious literary, artistic, political or scientific value. We would be misreading the message unmistakably transmitted by the Supreme Court were we to hold otherwise.

*Id.* at 210. The overall educational value, if any, of exposure to pornography does not create scientific value. Frederick F. Schauer, *The Law of Obscenity*, p. 147, Bureau of National Affairs, 1976. The trial court's charge followed the statute and was sufficient. Appellants' fifth point of error is overruled.

■ In their sixth point of error, appellants assert the jury charge improperly defined "prurient interest." They argue that the jury should have been told that it could not find appellants guilty if their program appealed only to the intended viewers' healthy interest in sex. The definition of "prurient interest" submitted to the jury reads:

> "Prurient interest" means a shameful, morbid, lascivious, or unhealthy interest in nudity, sex or excretion that goes substantially beyond customary limits of candor in description or representation of sexual conduct. It is marked by restless craving and is easily susceptible to lascivious thoughts or desires.

■ The Texas statute, like that of most states, does not define "prurient interest." *See* Tex. Penal Code Ann. § 43.21 (West 1994); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 505, n. 13, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). It is unnecessary to define "prurient interest" in the court's jury

charge. *Andrews v. State,* 652 S.W.2d 370, 376–77 (Tex.Crim.App.1983); *Ho v. State,* 856 S.W.2d 495, 500 (Tex.App.—Houston [1st Dist.] 1993, no pet.). When the charge submitted is a correct statement of the law, there is no harm in refusing another requested charge. *Bell v. State,* 582 S.W.2d 800 (Tex.Crim.App.1979); *Philen v. State,* 683 S.W.2d 440, 445 (Tex.Crim.App.1984). The charge given defined prurient interest as an "unhealthy interest in nudity, sex, or excretion." Logically, a healthy interest in sex is non-prurient. *See Ho,* 856 S.W.2d at 500. The trial court did not err in refusing the requested charge. Appellants' sixth point of error is overruled.

The judgments are affirmed.