STATE OF NEBRASKA, APPELLEE,
v. SCOTT A. HARROLD, APPELLANT.
585 N.W.2d 532

Filed October 27, 1998.   No. A-97-1167.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

SIEVERS, Judge.

A jury in the Lancaster County Court convicted Scott A. Harrold of producing or distributing obscene material, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-813(1) (Reissue 1995). Harrold's sentence was a fine of $1,000. On appeal, the district court for Lancaster County affirmed Harrold's conviction and sentence. On further appeal, we address evidentiary rulings by the trial court and also the core question of whether Harrold's self-produced videotape was obscene.

## FACTS

In late 1994, Harrold applied to TV Transmission, Inc., doing business as CableVision, for permission to broadcast "Cosmic Comedy," a television series he produced, on CableVision's public access channel. CableVision transmits cable television programming to its subscribers in and around Lincoln, Nebraska.

A copy of one of Harrold's written applications for permission to broadcast on CableVision was received in evidence at trial. In it, Harrold described "Cosmic Comedy" as an ongoing comedy series, with each episode 30 minutes in length, and he stated that he anticipated providing CableVision with four new episodes of the series each month. It is undisputed on the record that episodes of the series were generally 30 minutes in length. Harrold specifically noted in his application that the series depicted or described sexual or excretory activities or organs and that it also contained reviews of adult movies. Harrold requested that the series be broadcast at midnight.

CableVision granted Harrold's application, and in late 1994 or early 1995, he began providing CableVision with videotaped episodes of his series for broadcast on CableVision's public access channel. After Harrold completed production of each new episode, he delivered the videotaped episode to CableVision for broadcast. Harrold testified that he did not see CableVision's broadcasts of his series, because he did not subscribe to CableVision's service. Episodes of "Cosmic Comedy" were aired by CableVision on a regular basis until early 1997.

At trial, Harrold testified that he produced, directed, and often acted in the "Cosmic Comedy" episodes which he gave to CableVision for broadcast. Harrold explained that he designed the series to be an "experimental showcase," with a theme spoofing cheap science fiction films from the 1950's. Harrold stated that he had taken a course in "clowndom" at a local community college and that he had developed a cadre of a dozen or more clown characters who intermittently appeared on "Cosmic Comedy." These characters included clowns named "Cozblah" and "Crotchy," who appear in the episode at issue, and "Crappy," an older clown whom Harrold described as Crotchy's father.

On or about September 14, 1995, Harrold hand delivered a videotaped episode of the series to CableVision. This episode

was recorded on ¾-inch pneumatic videotape, a size and grade which is generally used only in professional broadcasting. The cover bore handwritten notations by Harrold that the videotape contained 20 minutes of material for broadcast during the "Cosmic Comedy" broadcast time period. A CableVision employee accepted the videotape from Harrold and gave it to David Grooman, CableVision's public access coordinator. Grooman watched this videotape, which at trial was labeled as exhibit 1. After viewing Harrold's videotape, Grooman made a copy of it on ½-inch videotape, which is the size of videotape used in most nonprofessional video cassette machines, and Grooman gave the copy to the Lincoln Police Department. This videotape was labeled at trial as exhibit 2. Harrold's original videotape, exhibit 1, was soon thereafter broadcast in its entirety by CableVision on its public access channel at least once, on or about September 24, 1995.

Exhibit 1, which was never seen by the jury, is 20 minutes in length. Exhibit 2, which was viewed by the jury, is only 16 minutes in length. It is undisputed that neither the credits nor program title were included in exhibit 2. There was little other testimony regarding any differences between exhibit 1 and exhibit 2. Exhibit 2 was the only videotape viewed by the jury, because the State and Harrold's counsel agreed that the jury would view exhibit 2 in making its determination. There is no evidence, or assertion by either party, that there are any differences between exhibit 1 and exhibit 2 which are of any consequence to our decision.

We have viewed all of exhibit 2, the first 14½ minutes of which shows a head-and-shoulders shot of Harrold in clown makeup, sunglasses, a false nose, and a close-fitting hat. Harrold appears to mouth words or sounds, and he grimaces and moves his head about in a writhing manner. The soundtrack accompanying these images contains mainly unintelligible distortions of Harrold's voice, and the content and meaning of his speech, if any, is incapable of determination.

Grooman found, as did we, that approximately the last 1½ minutes of Harrold's videotape is Harrold masturbating, while attired only in a clown face. In this part of the videotape, Harrold is shown alone, in a reclining position. He appears to be

nude, except for a pair of shiny sunglasses which cover his eyes, and his face is painted as a clown with a dark beard and white lips. The camera capturing these images was apparently positioned between Harrold's legs, so that the principal image framed by the camera is Harrold's hands stroking his erect penis, although his chest and face are visible. After 1½ minutes, Harrold simply stops masturbating, and it appears from exhibit 2 that he does not ejaculate. Very little sound accompanies the images of Harrold masturbating. Toward the end of this scene, Harrold makes several largely unintelligible comments, except that one can hear the phrases "left wing" and "for the ladies."

A police officer went to Harrold's home in late September 1995 and gave him a citation for distributing obscene material. In his conversation with the police officer, Harrold admitted that he was the person masturbating in the videotape provided by CableVision to the police. An amended charge of distributing obscene material under § 28-813(1)(a) and (b) was filed against Harrold in November 1996.

The amended charge against Harrold was tried to a county court jury on January 21 through 24, 1997. Before trial commenced, the trial court sustained several motions in limine by the State. Harrold was thereby prevented from introducing into evidence regulations of the Federal Communications Commission (FCC); CableVision's rules governing use of its public access channels, which rules include a protocol regarding distribution of indecent material; and the opinions of CableVision and its employees as to whether Harrold's videotape contained obscenity. The State also successfully moved in limine to prevent any evidence regarding whether CableVision was charged criminally for broadcasting Harrold's videotape. The State's basis for these motions, and upon which the trial court sustained them, was that such evidence was not relevant. Harrold twice made offers of proof regarding the excluded evidence, claiming that the evidence was relevant and went to his defense theory that the videotape was not obscene and that he did not knowingly produce or distribute obscene material.

Harrold testified that the content of the "Cosmic Comedy" series changed over time, based upon development of various characters and upon input from program viewers. Harrold also

stated that the series often included material which Harrold intended as political satire. Further, beginning in February 1995, some of the episodes included reviews of commercially produced X-rated movies obtained from various rental sources in Lincoln. The reviews were given by the clown character Crotchy, and they included segments excerpted from the reviewed films. The clips taken from the reviewed films always included images of fully nude women engaged in sexual acts and, over time, also included naked men. There was no evidence that any of these previous broadcasts had provoked criminal charges against Harrold.

Harrold testified that he rebroadcast the X-rated movie clips pursuant to a "fair usage" exception to copyright laws. Harrold stated that he voluntarily imposed a rating of "NC-17" (not for children under the age of 17) on "Cosmic Comedy" and that he made this rating designation known by visible or audible means on most episodes. Harrold testified that when selecting movies for review on "Cosmic Comedy," he specifically refused to use films which depicted sexual acts involving children, bestiality, torture, incest, or nonconsensual sexual relations.

Shortly before the broadcast of exhibit 1, the videotape which led to the charges against him, Harrold gave CableVision a different episode which contained a film excerpt depicting a woman stripping off her clothes and masturbating. Harrold was not prosecuted for the production or distribution of that episode. Harrold testified that he received favorable comments from male viewers about that episode, but at least one female viewer complained that Harrold's videotapes focused too much on female nudity and that they should include more male nudity. Harrold stated that he thereafter produced exhibit 1, a portion of which included himself nude and masturbating, "in response to audience input and . . . to entertain, make people laugh." Harrold testified that the clown character portrayed in the masturbation scene was Crotchy, who reviewed X-rated films in previous "Cosmic Comedy" episodes. Harrold did not deny at trial that he "produced [the videotape with the masturbation scene], directed, and the whole thing."

As noted above, exhibit 2 included a lengthy section before the masturbation scene which featured a clown's face and a

nearly incomprehensible soundtrack. Harrold testified that this character was Cozblah, who "lost his face in a capsule" and possessed a "beacon voice," which Harrold intentionally distorted so that Cozblah's speech was "screechy" and not readily understandable. Harrold stated on cross-examination that a viewer not familiar with "Cosmic Comedy" would not be able to identify this character as Cozblah or identify his whereabouts or activities based solely upon the images in exhibit 2. The change in scenes from Cozblah to the masturbating Crotchy is abrupt, without transition, and devoid of any indication of the impending shift in subject matter. The scene involving Crotchy likewise ends abruptly.

The county court jury convicted Harrold of producing or distributing obscene material, and he was fined $1,000. Harrold appealed the conviction to the Lancaster County District Court, which affirmed the conviction and the sentence. In its ruling, the district court stated that "[t]he [district] court does not believe it is required to make a decision independent of the jury determining whether the defendant's videotape is obscene or not obscene." Harrold thereafter timely filed his appeal with this court.

## ASSIGNMENTS OF ERROR

Harrold claims on appeal that his conviction and sentence should be reversed, and he has designated 44 assignments of error. We have reduced these to seven as follows: (1) The trial court wrongly restricted voir dire of the jury panel and erroneously overruled Harrold's motion to quash the panel; (2) the trial court erred in refusing to allow him to introduce evidence of FCC and CableVision rules and regulations; (3) the trial court erred in refusing to allow evidence of the actions and opinions of CableVision employees regarding the alleged obscenity of Harrold's videotape and in refusing to allow evidence regarding whether CableVision was criminally charged for broadcasting Harrold's videotape; (4) the trial court, and the district court sitting as an appellate court, erred in failing to independently determine as a matter of law whether the work was obscene; (5) the trial court erred in refusing two jury instructions proposed by Harrold; (6) Harrold's conviction was

not supported by sufficient evidence; and (7) Harrold received an excessive sentence. We deal only with those assignments of error necessary to resolve this appeal.

## STANDARD OF REVIEW

■ In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those circumstances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998).

■ In a criminal appeal from county court, appellate courts generally review for error on the record. See *State v. Rubek*, 7 Neb. App. 68, 578 N.W.2d 502 (1998).

## ANALYSIS

*Obscenity and Law.*

Section 28-813(1) makes it a crime to knowingly prepare, produce, or distribute obscene material. This statute was promulgated after the U.S. Supreme Court issued its landmark ruling in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). *Miller* reinforced the States' power to regulate " 'the intractable obscenity problem.' " 413 U.S. at 16, quoting *Interstate Circuit v. Dallas*, 390 U.S. 676, 88 S. Ct. 1298, 20 L. Ed. 2d 225 (1968) (Harlan, J., concurring and dissenting).

The *Miller* majority provided the following basic guidelines (the *Miller* test) for the trier of fact to apply in determining if a given work is obscene:

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24.

■ To regulate or prohibit publications, the State must prove all three parts of the *Miller* test. *U.S. v. Various Articles of Obscene Merchandise*, 709 F.2d 132 (2d Cir. 1983). Nebraska's present obscenity statutes are modeled largely after the *Miller*

test. See, e.g., Neb. Rev. Stat. § 28-807(10) and (15) (Reissue 1995).

Obscene materials are not within the ambit of speech or press protected by the First Amendment to the federal Constitution or Neb. Const. art. 1, § 5. See, *Miller, supra*; *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957); *State v. American Theater Corp.*, 194 Neb. 84, 230 N.W.2d 209 (1975). Materials which are considered indecent, as opposed to obscene, are entitled to constitutional protection. *Manual Enterprises v. Day*, 370 U.S. 478, 82 S. Ct. 1432, 8 L. Ed. 2d 639 (1962); *U.S. v. M-K Enterprises, Inc.*, 719 F. Supp. 871 (D. Neb. 1989). The U.S. Supreme Court has characterized the distinction between indecent material entitled to constitutional protection and unprotected obscenity as a "dim and uncertain line." *Jacobellis v. Ohio*, 378 U.S. 184, 187, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964). Appeal to the prurient interest is a key component in determining if a work is obscene and therefore not constitutionally protected. *Miller, supra*. Material does not evoke a prurient interest unless it has a capacity to provoke "sexual responses over and beyond those that would be characterized as normal." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985).

Nudity is not necessarily obscene. *Jenkins v. Georgia*, 418 U.S. 153, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974). Likewise, portrayals of sexual activity may not be per se obscene, see *Jacobellis, supra*; *Kois v. Wisconsin*, 408 U.S. 229, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972); *M-K Enterprises, Inc., supra*, even if they are characterized by some as "dismally unpleasant, uncouth, and tawdry," *Manual Enterprises*, 370 U.S. at 490.

It is in this context that we use Judge Urbom's opinion in *M-K Enterprises, Inc., supra*, as a prime example of the principle that what most people would find offensive is not necessarily obscene from a constitutional viewpoint. In *M-K Enterprises, Inc.*, five counts of obscenity-related crimes were charged against individual and corporate defendants selling sexually explicit material in southeast Nebraska. The case was tried to the court, which found that three of the four works at issue were obscene. The fourth work, a commercially produced videotape entitled "The Event," contained images of heterosex-

ual sexual activity, including vaginal intercourse and fellatio between two men and a woman; homosexual anal intercourse and fellatio between two men; and cunnilingus between two women. The trial court applied its understanding of contemporary community standards of an average person in southeast Nebraska and found that "[i]t is unbridled sex, the eager, unabashed, no-holds-barred doing of raw sex—oral, manual, vaginal, anal, heterosexual and homosexual—in multiple positions and in wearisome repetition." 719 F. Supp. at 878. Despite the graphic nature of the videotape's representations, the trial court nonetheless found the videotape not obscene, holding that

> [the videotape] is a crude expression of a primitive passion, exaggerated by patently offensive full-screen close-ups of the sex parts in action. That is what it is, nothing more and nothing less.
>
> There is no force, no deliberate pain, no inanimate insertions, no bondage, no involvement of children or animals and no deception.

*Id.* The court found that despite the videotape's graphic nature, it did not appeal to the "darker side of sex," and that, therefore, the videotape was not illegally obscene. *Id.* Accord, *Manual Enterprises, supra*; *City of St. George v. Turner*, 860 P.2d 929 (Utah 1993); *People v. Correa*, 191 Ill. App. 3d 823, 548 N.E.2d 351 (1989).

In determining whether a work appeals to the prurient interest under the first prong of the *Miller* test, it must be judged as a whole, and not on the basis of isolated portions. *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973); *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). The context in which the sexual material is presented must also be considered. See *Kois, supra*. A leading scholar in this field has suggested that the *whole work* concept may well be identical to the *dominant theme* concept in *Roth, supra*. See Frederick F. Schauer, *The Law of Obscenity* (1976).

If a work's predominant appeal, considered in the context of the work's entirety, is to sexual interest that is not deviant, the work may be considered indecent rather than obscene and, thus, entitled to constitutional protection. *Brockett, supra*; *Jenkins, supra*; *Jacobellis v. Ohio*, 378 U.S. 184, 84 S. Ct. 1676,

12 L. Ed. 2d 793 (1964); *U.S. v. M-K Enterprises, Inc.*, 719 F. Supp. 871 (D. Neb. 1989). We note, however, that indecent material may be subject to legitimate regulation as to the time, place, and manner of its publication. See, *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989); *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S. Ct. 3026, 57 L. Ed. 2d 1073 (1978).

A person charged civilly or criminally with violating the Nebraska obscenity statutes is entitled to present evidence in his or her defense and in support of his or her theory of defense, including, but not limited to, expert witnesses; proof of financial interest, or lack thereof, in the allegedly obscene work; and evidence to support a claim that the challenged work has serious literary, artistic, or scientific merit. Neb. Rev. Stat. §§ 28-814 and 28-815 (Reissue 1995); *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997). When charged as a criminal offense, each element of an obscenity-related crime, including the intentional nature of the crime charged, must be proved by the State beyond a reasonable doubt, just like other criminal charges. See, e.g., *Pope v. Illinois*, 481 U.S. 497, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987).

*Exclusion of CableVision Rules from Evidence.*

Harrold has assigned error to several evidentiary rulings by the trial court. We touch on these matters only briefly, because we are convinced that ultimately our duty in this case is to say whether 16 minutes of videotape, with approximately 90 seconds of Harrold masturbating, is obscene.

Harrold wanted to offer evidence (1) that there were Cable-Vision rules in a handbook allowing the broadcast of indecent material between midnight and 1 a.m., (2) that obscene material could not be broadcast on the public access channel, (3) that questionable material was reviewed by the CableVision advisory board, and (4) that CableVision was not prosecuted for showing Harrold's videotape to the public. The trial court sustained the State's motions in limine on these matters. Thus, Harrold was foreclosed from the obvious defense (1) that his videotape could not have been obscene because it was broadcast by CableVision, and by its rules, CableVision did not broadcast obscene material; (2) that his videotape could not have been

obscene because it was not reviewed by the advisory board, whose job it was to review questionable programs; (3) that CableVision obviously "distributed" the videotape by broadcasting it but that neither CableVision nor its employees were prosecuted; and (4) that Harrold's submission was in accordance with the rules on indecent material and that thus he did not have the requisite criminal intent to distribute obscene material. Procedurally, Harrold preserved his right of appellate review on these evidentiary matters.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996), relying on Neb. Rev. Stat. § 27-401 (Reissue 1995). All relevant evidence normally is admissible, and conversely, evidence which is not relevant is not admissible. *McBride, supra.* The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding relevancy will not be reversed absent an abuse of discretion. *Id.* A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *State v. Vogel*, 247 Neb. 209, 526 N.W.2d 80 (1995).

Materiality and probative value are the two components to relevancy. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Materiality pertains to the relation between the proposition for which the evidence is offered and the issues in the case. *Id.* If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. *Id.* What is " 'in issue' " within the litigated controversy is determined by the pleadings in the case, read in light of the rules of pleading and controlled by applicable substantive law. *Id.* at 844, 524 N.W.2d at 48. Probative value, the second prong of relevance, is a relative concept. *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997). It involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact

exists, and a measurement of the distance of the particular fact from the ultimate issues of the case. *Id.* In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998).

The State's burden was to prove beyond a reasonable doubt that Harrold knowingly produced or distributed obscene material, thus putting his intent at issue. Harrold attempted to show that he did not knowingly violate § 28-813(1), because he complied with the CableVision rules handbook. Further, Harrold attempted to show that because the videotape was aired, it was only indecent and not obscene. The material excluded by the successful motions in limine would have been components of this intent-based defense.

In *Hamling v. United States*, 418 U.S. 87, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974), the U.S. Supreme Court reiterated its conclusion from earlier cases that the word "obscene," as it was used in that case to describe or categorize a criminal offense, is a legal term of art and that the prosecution must prove scienter to satisfy the elements of the crime of distributing obscene material. The law is the same in Nebraska. *State v. American Theatre Corp.*, 196 Neb. 461, 244 N.W.2d 56 (1976). In *Hamling,* the U.S. Supreme Court specifically declined to require proof of a defendant's actual knowledge of the legal status of the materials claimed to be obscene. Accord, *State v. Embassy Corp.*, 215 Neb. 631, 340 N.W.2d 160 (1983); *American Theatre Corp., supra* (holding that prosecution need prove only that defendant knew contents of material and their character and nature). As the Nebraska Supreme Court noted, quoting *Hamling,* " 'To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law.' " *American Theatre Corp.*, 196 Neb. at 471, 244 N.W.2d at 62. But as the court in *American Theatre Corp.* observed, Nebraska statutes incorporate a requirement that the distribution be made " '*knowingly.*' " *Id.* at 470, 244 N.W.2d at 62. We take that to mean that the defendant knows the contents, nature, and character of the material at issue.

In one of his offers of proof, Harrold attempted to testify that he believed the videotape was indecent, but not obscene. Harrold and Grooman testified that during the 6-month period preceding this videotape's broadcast, numerous episodes of "Cosmic Comedy" contained explicit scenes of nude males and females engaged in graphic sexual acts, and Harrold testified that at least one episode depicted a female stripping off her clothes and masturbating. There is no evidence in the record that CableVision or any other entity questioned whether such images were obscene, submitted the prior programs to the advisory board, or attempted to prevent or otherwise suppress the broadcast of the videotapes.

Harrold stated, in an offer of proof, that he believed the X-rated movie excerpts which he included in previous "Cosmic Comedy" episodes, and which were broadcast without inquiry or complaint, were representative of the community standard referred to in the CableVision rules handbook upon which he relied generally and upon which he specifically relied as to the challenged material. We do not understand how the rules governing what CableVision would or would not broadcast could not be relevant. The rules tend to show, given Harrold's testimony and the fact that the videotape was broadcast, that his videotape was only indecent, and that he did not knowingly distribute obscene material. Harrold was entitled to have the jury consider the rules and the obvious inferences deducible therefrom in light of the fact that the videotape was broadcast, as was an earlier work showing a female disrobing and masturbating, without any prosecution. Such evidence also clearly goes to the issues of "contemporary community standards" and patent offensiveness, given that what CableVision decides to broadcast is both a measurement and source of community standards.

We also find that the State "opened the door" for the admission of the contested evidence by asking Harrold on cross-examination: "And you wanted your movies shown — or your videos shown after midnight because you thought that that might lessen the possibility that children or juveniles would be exposed to it, correct?" Obviously constrained by the court's prior ruling excluding evidence of CableVision's rules, Harrold answered: "I couldn't answer that question 'cause I can't — I

can't tell who's gonna be watching what." The State further inquired: "You just asked to have it run after midnight because you like having it run after midnight, no other reason?"

At this point, Harrold's counsel objected and argued unsuccessfully that the State had "opened the door" to the definitions and regulatory content contained in the previously excluded CableVision rules and handbook, which included rules regarding the permissible time for broadcasting indecent material. Harrold's counsel made another offer of proof. The trial court again refused to allow Harrold to introduce such evidence. We hold that the trial court abused its discretion in preventing Harrold from offering evidence about CableVision's rules to respond to previously prohibited evidentiary topics broached by the State on cross-examination. The State asked Harrold why he wanted the videotape shown after midnight, and he should have been allowed to answer, using the CableVision rules.

Harrold admitted in his offer of proof that the work at issue was indecent, but he denied that it was obscene. As shown by his offers of proof, Harrold testified that he was familiar with the distinction between these terms as set forth in the CableVision rules and that he affirmatively sought to abide by these rules, including ensuring that "Cosmic Comedy" was broadcast only during such times as permitted by CableVision for indecent material. That evidence was relevant. Moreover, the State "opened the door" on the matter and magnified its importance to the jury by attacking Harrold's reasons for his requested time of broadcast.

Without the CableVision rules being admitted into evidence, the jury could have inferred from the State's cross-examination of Harrold that his request for late night broadcast time was indicative of his knowledge that the videotape was obscene and unfit to be seen. But had the rules been in evidence, the jury could have alternatively inferred that Harrold thought the material was merely indecent and therefore permissible for broadcast at certain hours and that Harrold's intent was only to distribute lawful, indecent material.

As a result of the trial court's rulings, the jury was likewise prevented from learning that Grooman, CableVision's public access coordinator, followed a particular procedure when

arguably obscene materials were submitted for broadcast but that he did not follow that process in connection with Harrold's work. Harrold could posit a favorable inference therefrom that Grooman had concluded that the material was not obscene, which goes to the issue of contemporary community standards. Had the jury known that Grooman had not submitted Harrold's material to the board, one permissible inference for the jury was that CableVision, like Harrold, considered the videotape at issue to be indecent and suitable for broadcast, but not obscene.

In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). We cannot conclude that the trial court's error in refusing to admit the disputed evidence was harmless beyond a reasonable doubt. Therefore, the rulings on evidence would mandate, at a minimum, a reversal and a new trial.

*Sufficiency of Evidence and Independent Appellate Review of Work.*

Although we would reverse Harrold's conviction based on a prejudicial evidentiary ruling, we must examine the sufficiency of the evidence presented against him before we can order a new trial. See, *State v. Christner*, 251 Neb. 549, 557 N.W.2d 707 (1997); *State v. Lee*, 227 Neb. 277, 417 N.W.2d 26 (1987). See, also, *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

In *Lee, supra*, the Nebraska Supreme Court stated that where the issue of sufficiency of evidence is raised on appeal, as in the instant case, "[i]f it appears the evidence is sufficient to support the convictions, the cause may be remanded to the district court for further proceedings; if the evidence is not sufficient . . . the cause must be dismissed." 227 Neb. at 283, 417 N.W.2d at 30. Additionally, we must speak to the scope of appellate review in an obscenity prosecution.

On appeal to this court, Harrold claims that the district court erred in failing to make a determination independent of the jury's findings, whether the work was obscene as a matter of law, given the protections of the 1st and 14th Amendments to the

federal Constitution. Nebraska law provides that criminal prosecutions involving the ultimate issue of obscenity shall be tried to a jury, unless the defendant so charged waives the right to jury trial and opts for trial to the court. § 28-814(1). However, it has long been the law that a jury is not empowered with unfettered discretion to determine whether a questioned work is, in fact and at law, obscene. In *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974), the U.S. Supreme Court held:

> Even though questions of appeal to the "prurient interest" or of patent offensiveness are "essentially questions of fact," it would be a serious misreading of *Miller [v. California]* to conclude that juries have unbridled discretion in determining what is "patently offensive." Not only did we there say that "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary," . . . but we made it plain that under that holding "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct . . . ."

The constitutional duty of judicial review of allegedly obscene material, independent of a jury's conclusions, springs from "the inherent dangers of undertaking to regulate any form of expression." *Miller v. California*, 413 U.S. 15, 23, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). In *Jenkins, supra*, the U.S. Supreme Court reiterated the premise articulated in *Jacobellis v. Ohio*, 378 U.S. 184, 187-88, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964), and relied upon in *Miller*:

> Application of an obscenity law to suppress a motion picture thus requires ascertainment of the "dim and uncertain line" that often separates obscenity from constitutionally protected expression. . . . Since it is only "obscenity" that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law.

Regardless of the jury's finding that a particular work is obscene, an appellate court ordinarily must reach an indepen-

dent decision regarding the alleged obscenity of the work, because *substantive constitutional limitations govern.* See *Miller, supra.* Accord, *Jenkins, supra*; *Kois v. Wisconsin,* 408 U.S. 229, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972); *Jacobellis, supra.* The constitutional limitations involved in an obscenity case are issues of law.

■ As a general rule, the Nebraska appellate courts determine questions of constitutional dimension independent of conclusions reached by trial courts. *State v. Sommerfeld,* 251 Neb. 876, 560 N.W.2d 420 (1997). Relying on *Jacobellis,* the Nebraska Supreme Court adopted the practice of independent judicial review of allegedly obscene materials in *State v. American Theater Corp.,* 194 Neb. 84, 230 N.W.2d 209 (1975).

Following application of the *Miller* standards by the fact finder, the final measure of scrutiny comes in the form of appellate court assessment of the alleged obscenity of the work as a matter of law, a conclusion arrived at independent of the jury's findings. As expressed by Justice Harlan in his separate concurrence and dissent in *Roth v. United States,* 354 U.S. 476, 497, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957):

> Every communication has an individuality and "value" of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppress[i]ble within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

In concluding that an appellate court is bound to conduct an independent review of the allegedly obscene material as a whole, we follow precedent set by federal courts and the Nebraska Supreme Court, as well as the practice of a multitude of other state courts. See, e.g., *People v. Correa,* 191 Ill. App. 3d 823, 548 N.E.2d 351 (1989); *Little Store, Inc. v. State,* 295 Md. 158, 453 A.2d 1215 (1983); *People v Austin,* 76 Mich. App. 455, 257 N.W.2d 120 (1977); *State v. Davidson,* 481 N.W.2d 51

(Minn. 1992); *McNary v. Carlton*, 527 S.W.2d 343 (Mo. 1975); *Urbana, ex rel. Newlin, v. Downing*, 43 Ohio St. 2d 109, 539 N.E.2d 140 (1989), *cert. denied* 493 U.S. 934, 110 S. Ct. 325, 107 L. Ed. 2d 315 (1989); *Rees v. State*, 909 S.W.2d 264 (Tex. App. 1995), *cert. denied* 519 U.S. 863, 117 S. Ct. 169, 136 L. Ed. 2d 111 (1996); *City of St. George v. Turner*, 860 P.2d 929 (Utah 1993). Compare, *City of Farmington v. Fawcett*, 114 N.M. 537, 843 P.2d 839 (N.M. App. 1992).

*"Whole Work" Doctrine.*

Under the test to determine obscenity articulated by the U.S. Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), and incorporated into § 28-807, an appellate court is required to review the allegedly obscene work by considering the work as a whole. See § 28-807(10)(a). Specifically, in determining whether a work appeals to the prurient interest, it must be judged as a whole, and not on the basis of its isolated parts. *Miller, supra*; *Roth, supra*. Accord *State v. Jensen*, 226 Neb. 40, 409 N.W.2d 319 (1987). The context in which the sexual material is presented must also be considered. *Kois v. Wisconsin*, 408 U.S. 229, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972). Compare, *Rees*, 909 S.W.2d at 268 (reviewing allegedly obscene material in "thematic units"). It has been held that failure to present and consider the challenged work in its entirety may be prejudicial error. See, e.g., *Cambist Films, Inc. v. Duggan*, 298 F. Supp. 1148 (W.D. Pa. 1969), *rev'd on other grounds* 420 F.2d 687 (3d Cir. 1969); *Deverell v. Com.*, 539 S.W.2d 301 (Ky. 1976). It is at this point that our dissenting colleague parts company with us. We disagree on what the whole work doctrine means in the context of this case, and because of its impact on the ultimate resolution of the appeal, we discuss the whole work doctrine at some length. This takes us back to exhibits 1 and 2.

It is clear that exhibit 2 is somewhat different from exhibit 1. Exhibit 1 is the original ¾-inch videotape actually produced by Harrold and broadcast by CableVision. Exhibit 2 does not contain a title, credits, or other information which identifies the episode. Exhibit 2 is 16 minutes in length, not 20 minutes as indicated on the jacket of exhibit 1. Exhibit 1 was offered into

evidence without objection, but not shown to the jury. Exhibit 2 was also offered into evidence. Harrold and the State agreed that exhibit 2, which is not the entire original work, would be shown to the jury in order to determine the issue. Neither side to the case asked that exhibit 1 be shown to the jury. Harrold did not claim at trial, nor does he now claim, that exhibit 1 contains material which proves that the work at issue is not obscene.

In summary, the trial record reveals that the State and Harrold were completely content to try the obscenity question by using only exhibit 2. As we understand the dissent of our esteemed colleague, it is that we as an appellate court must view exhibit 1, the original videotape, in order to determine whether the whole work is obscene, despite the absence of a claim by the State that it contains material which anyone could consider obscene. In contrast, we believe that the whole work doctrine is applied to ensure that an obscenity conviction, which represents governmental censorship, is not based on an unrepresentative piece of the whole, taken out of context, which piece distorts the theme of a work so that the work appears other than it really is. The doctrine also serves to ensure that triers of fact and appellate courts see the actual work at issue, as opposed to relying on someone else's description or characterization thereof. In the context of how this case was tried, we believe that the whole work doctrine does not require an appellate viewing of exhibit 1, *unless* we were prepared to say that the 90 seconds of Harrold stroking himself makes exhibit 2 obscene. In that instance, our colleague's view might be correct, despite the absence of a claim from Harrold that we must view exhibit 1.

In reaching the foregoing conclusion, we rely on the progression of the law of obscenity, illustrated by the U.S. Supreme Court's summary in *Roth v. United States*, 354 U.S. 476, 488-89, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957), which recounts that the early legal standard of obscenity "allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. *Regina* v. *Hicklin*, [1868] L. R. 3 Q. B. 360." The *Roth* Court rejected the earlier *Hicklin* standard because judging obscenity by the effect of isolated passages upon susceptible persons could lead to the suppression of material legitimately dealing with sex, and such a standard consti-

tuted an unconstitutional restriction of the freedoms of speech and press. Thereafter, in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S. Ct. 975, 16 L. Ed. 2d 1 (1966), the Court held that for there to be a finding of obscenity, (1) the dominant theme of the material taken as a whole must appeal to a prurient interest in sex, (2) the material is patently offensive because it offends contemporary community standards relating to the description or representation of sexual matters, and (3) the material is utterly without redeeming social value. While the third factor has been modified by *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973) (whether work taken as whole lacks serious literary, artistic, political, or scientific value), the first two factors retain their vitality.

An isolated portion of a movie cannot be extracted out of the context of the whole, and the entire movie judged thereon. *La Rue v. State of California*, 326 F. Supp. 348 (1971). Put another way, the object, book, magazine, or film can be judged obscene only after consideration of the allegedly objectionable aspects in the context of the entire work. *Bryers v. State*, 480 S.W.2d 712 (Tex. 1972). In *United States v. Head*, 317 F. Supp. 1138, 1142 (E.D. La. 1970), the court interpreted the Supreme Court's obscenity pronouncements as "consistently unanimous on the proposition that material must be judged as a whole in order to determine whether it is obscene, before it can be suppressed because it contains offensive segments."

In *State v. Starr Enterprises, Inc.*, 226 Kan. 288, 597 P.2d 1098 (1979), the Supreme Court of Kansas saw the phrase "taken as a whole" as being used to eliminate segmented reviews of material, and the court quoted as follows from *Penthouse Intern., Ltd. v. McAuliffe*, 454 F. Supp. 289 (N.D. Ga. 1978):

> "First, the 'taken as a whole' standard of *Miller* is not really new . . . and simply reflects in essence the practical fact that an arguably obscene book or magazine is going to be published or banned as a discreet unit. . . . A magazine is a 'whole' within the meaning of *Miller* and it must be judged as such."

226 Kan. at 293, 597 P.2d at 1103.

██ Based on the time-honored rejection by the *Roth* Court of the *Hicklin* test, we believe that the "taken as a whole" doctrine is a defendant's doctrine designed to protect against prosecutions based upon segments lifted out of the context of the entire work, which segments distort the thematic context of the work at issue.

We acknowledge the repeated "mantra" in the cases about reviewing the entire work or the whole work. But we have found neither authority nor a rationale for using the whole work doctrine to reverse a conviction but still allow further prosecution, as our colleague's dissent would do, simply because the record contains a piece of the work which neither prosecution nor defense thought material for the jury to convict or acquit. In short, we have found no case where an appellate court has reversed because it could not, or did not, watch a piece of film which neither prosecution nor defense thought the jury should see.

In reaching a conclusion on how the whole work doctrine should be applied, we rely on the fundamental role that the adversary system plays in trials. If exhibit 1 contained either incriminating or exculpatory information, one side or the other would have played the extra 4 minutes for the jury. And we cannot ignore the fact that neither side asks that we view exhibit 1. Therefore, we believe that the whole work doctrine, in the unusual context of this case, means that our independent appellate review of this case requires scrutiny only of the work which was played for the jury and which the State contends is obscene. That work, exhibit 2, was agreed by the State and the defense to be the work upon which Harrold's guilt or innocence would be decided. In short, both parties, by their conduct at trial and upon appeal, have made exhibit 2 the "whole work." Accordingly, we refrain from invoking our Neb. Ct. R. of Prac. 5B(7) (rev. 1996) making VHS the appellate standard videotape and providing that "[i]f any other videotape, e.g., Beta, is presented to the court," then the submitting party shall provide at his or her expense "the appropriate equipment for playback." As we believe viewing exhibit 1 is superfluous for purposes of our review, we now turn to the core of this case, which cannot be avoided. Do we, as the reviewing appellate court, find the work to be obscene?

*Is Exhibit 2 Obscene?*

Exhibit 2 contains 14½ minutes of a head-and-shoulders shot of Harrold in space traveler/clown makeup, bathed in a greenish light, with unintelligible noise in the background. Without warning or apparent reason, the videotape immediately switches to a shot of part of the legs, torso, and face of a nude Harrold, in clown face, stroking his erect penis. The masturbation lasts for 1½ minutes, and there is no ejaculation. The only intelligible statements we can discern are "left wing" and "for the ladies." Earlier in this opinion, we recounted Harrold's description of the videotape: It portrays one of his clown characters, Cozblah, traveling in space, and then another clown character, Crotchy, masturbating. The masturbation is allegedly in response to a viewer's complaint about Harrold's videotapes not showing enough male nudity. Testing the 16-minute videotape against the three prongs of the *Miller* test, and reminding ourselves that all three prongs must be proved by the State, see *U.S. v. Various Articles of Obscene Merchandise*, 709 F.2d 132 (2d Cir. 1983), we conclude that Harrold's videotape is not obscene.

To a viewer who happened to stumble upon it, the first 14½ minutes would make absolutely no sense, and we have difficulty imagining anyone finding that portion educational, enlightening, humorous, or thought provoking. The last 1½ minutes do not improve the videotape or change any of the above observations. Perhaps a regular viewer of Harrold's "program," which the evidence indicates was broadcast over a rather lengthy period of time on the public access channel, might find some humor in the two "clowns" portrayed in different situations. However, any humor or other entertainment from the videotape could only have been appreciated by the regular and initiated viewer of Harrold's work. Whether there were any such people, we simply do not know.

As was stated in *State v. Walden Book Co.*, 386 So. 2d 342, 345 (La. 1980), regarding the "serious value" of a work:

> The addition of the "serious" element allows the trier of fact to look to the intent upon which the insertion of literary, artistic, political, or scientific material is based. If that intent is to convey a literary, artistic, political, or scientific idea, or to advocate a position, then the intent is "serious."

Conveying humor is undoubtedly "serious" in that it is recognized as of general benefit to society, but we cannot find any humor in Harrold's videotape. The phrase "left wing" is spoken at the end of the videotape, and perhaps Harrold intended to convey some sort of "left wing" statement, but we discern no serious political ideas in the videotape. To us, the videotape is simply weird. We are unable to find that the work has serious literary, artistic, political, or scientific value, and therefore it fails the third prong of the *Miller* test.

The second prong of the *Miller* test is whether the work depicts in a patently offensive way sexual conduct specifically defined by the applicable state law. The first prong of the *Miller* test is whether the average person, applying contemporary community standards, would find that the work taken as a whole appeals to prurient interest. "Prurient interest" and "patently offensive" may, to some extent, be discussed together. In a footnote, the Supreme Court in *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957), set forth a number of definitions of "prurient" and because of its significance, we quote verbatim:

*I. e.*, material having a tendency to excite lustful thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines *prurient*, in pertinent part, as follows:

". . . Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd. . . ."

*Pruriency* is defined, in pertinent part, as follows:

". . . Quality of being prurient; lascivious desire or thought. . . ."

See also *Mutual Film Corp. v. Industrial Comm'n*, 236 U. S. 230, 242, where this Court said as to motion pictures: ". . . They take their attraction from the general interest, eager and wholesome [as] it may be, in their subjects, but a *prurient interest may be excited and appealed to*. . . ." (Emphasis added.)

We perceive no significant difference between the meaning of obscenity developed in the case law and the

definition of the A. L. I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), *viz.*:

". . . A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. . . ." See Comment, *id.*, at 10, and the discussion at page 29 *et seq.*

This footnote in *Roth* has led one author to write:

[P]rurient appeal merely means sexually stimulating, and that seems to have been the purpose of the prurient-interest requirement. Not all discussions or pictures of sexual activity are necessarily stimulating sexually, so it is this narrowing that seems the purpose of the requirement. It is those materials that have potentially physical as opposed to intellectual effect that are to be within the ambit of the obscenity laws. This separation of the physical from the intellectual appears to explain the necessity of an appeal to the prurient interest.

Frederick F. Schauer, *The Law of Obscenity* § 5.1 at 98 (1976). Schauer also states that the prurient appeal requirement ensures that not every discussion or depiction of sex may be characterized as obscene. In *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971), the Court said that whatever else may be necessary to give rise to the State's broad power to prohibit obscene expression, such expression must be, in some significant way, erotic.

In *United States v. A Motion Picture Film*, 404 F.2d 196 (2d Cir. 1968), the Second Circuit Court of Appeals reversed a jury's finding that the motion picture "I Am Curious-Yellow" was obscene. The court concluded that although sexual conduct was undeniably an important aspect of the film, and may be one of its principal themes, it could not be said that " 'the dominant theme of the material taken as a whole appeals to a prurient interest in sex.' " *Id.* at 199.

Applying these notions to Harrold's work, we hold that exhibit 2, taken as a whole, does not appeal to a prurient interest, i.e., a shameful or morbid interest in sex. The videotape as

a whole is hardly erotic and cannot be said to appeal to and excite a prurient interest in sex. Certainly, it does not appeal to the "darker side of sex," in the words of *U.S. v. M-K Enterprises, Inc.*, 719 F. Supp. 871, 878 (D. Neb. 1989). The videotape does not show exploitive or violent sex; involves no children, animals, or objects; and shows only a brief and solitary act of incomplete self-gratification. Moreover, its dominant theme, if measured on a time basis, is not sexual. The great majority of the videotape shows Harrold's space traveler clown, Cozblah, depicted in a completely benign, albeit strange, way. Its theme, according to Harrold's testimony, is the humorous depiction of Harrold's clown characters. We cannot conclude that the average person, applying contemporary community standards of the late 1990's, would find that the 16 minutes of videotape in exhibit 2 appeals to a prurient interest in sex. Whom or what it appeals to is a much more difficult question, and one which we cannot answer.

Turning to the patently offensive prong, we again rely on Schauer's analysis:

> The development of the "patently offensive" standard also explains its meaning, for in each of the uses of the term prior to *Miller* it was equated with an affront to or surpassing of the current level of society's acceptance of sexual depictions or descriptions. Nowhere in the Supreme Court cases is there any reference to dictionary definitions of patent offensiveness, and it seems clear that the intent was for the trier of fact to gauge whether the material at issue exceeded that which society generally considers decent, or at least tolerates.

Schauer, *supra*, § 5.2 at 103-04.

Masturbation is obviously a sexual act, and Harrold's portrayal of it is graphic and has no seeming purpose. However, the clown character Crotchy is not particularly excited or stimulated while masturbating. His rather bland, tedious, and brief portrayal of this act of self-gratification has an air of disinterest about it. It does manage to be weird; however, the videotape, taken as a whole, cannot be described as focusing predominantly upon what is sexually morbid, grossly perverse and bizarre, and insulting to the human spirit and sexuality. See

*State ex rel. Dowd v. Motion Picture "Pay the Baby Sitter,"* 31 Ohio Misc. 208, 287 N.E.2d 650 (1972).

Schauer states that the patent offensiveness standard is designed to ask the jury, "'[D]oes this material go too far?'" Schauer, *supra*, § 5.2 at 104. Going "too far" is a matter of whether the videotape exceeds the customary limits of candor in contemporary society. Without engaging in a lengthy discourse about what sexually explicit material is available and consumed in our late 1990's society, and avoiding commentary on the role sex plays in entertainment and advertising, we are constrained to hold that Harrold's videotape, while candid, does not go too far in its depiction of masturbation. We find that exhibit 2, which was displayed to the jury as evidence of his alleged crime, is not obscene.

## CONCLUSION

The district court misperceived its duty with respect to independent appellate review of Harrold's videotape, and the county court made prejudicial errors concerning the evidence. However, we must still answer the question of whether exhibit 2, the videotape that both the State and Harrold agreed was at issue, is legally obscene. While the adjectives strange, weird, graphic, unnecessary, distasteful, indecent, and offensive are all applicable to Harrold's videotape, it is not legally obscene.

While we have written a fair amount here, we cannot help but see in this case the applicability of one of the most succinct and famous phrases ever written in an appellate opinion. Mr. Justice Stewart, in his concurrence in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964), said that the 1st and 14th Amendments to the Constitution allowed the criminal law to regulate only "hard-core" pornography and that he would not attempt to define that term. Justice Stewart wondered if he could even succeed in intelligibly doing so. He then said the famous words: "But I know it when I see it." *Id.* Perhaps that helps sum up our opinion of Harrold's meaningless home movie: It is hard to define what the videotape says and what it means, if anything, but it is not hardcore pornography. Therefore, it is protected by the 1st and 14th Amendments. The evidence is not sufficient to sustain the conviction.

REVERSED AND DISMISSED.

MILLER-LERMAN, Chief Judge, concurring in part, and in part dissenting.

I respectfully concur in part and dissent in part.

I concur with the majority's conclusion that the exclusion of the CableVision rules and regulations was prejudicial error requiring reversal. However, I dissent with respect to the majority's analysis of the independent appellate task which this court is to and can undertake in this case. Specifically, as presented on appeal, I do not think this court can review exhibit 1, the work as a whole and, therefore, cannot opine on whether the work as a whole is or is not obscene. I would, therefore, reverse without direction rather than reverse and dismiss.

It is clear under the literature pertaining to obscenity that at the trial level, the jury's determination of whether the challenged work is or is not obscene is a question of fact. *Jenkins v. Georgia*, 418 U.S. 153, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974). The State and Harrold stipulated, as they are free to do as trial strategy, that the jury could perform its function by viewing exhibit 2, less than the whole.

It is also clear under the statute and cases that on appeal, the appellate court must review the entire work in conducting its independent appellate review. Section 28-813; *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973); *Kois v. Wisconsin*, 408 U.S. 229, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972). The duty of the appellate court is to review the work as a whole, and this issue is to be decided by the appellate court as a matter of law. *State v. American Theater Corp.*, 194 Neb. 84, 230 N.W.2d 209 (1975). The parties' trial stipulation regarding the jury's factfinding function does not alter the duty or task of the appellate court to review the entire work which was produced, distributed, and forms the basis of the charges against Harrold and to decide the obscenity issue as a matter of law. In this regard, the Nebraska Supreme Court has stated:

> [T]he usual test in reviewing a jury verdict, i.e., is the finding supported by sufficient evidence, is not applicable in First Amendment cases and since it is only "obscenity" that is excluded from constitutional protection, the question whether a particular work is obscene is an issue which

must be decided by the court *as a matter of law*, in review-
ing such cases.

(Emphasis supplied.) 194 Neb. at 89, 230 N.W.2d at 212-13.

In the instant case, exhibit 1, the whole work which gave rise
to the charges against Harrold, was received in evidence. An
independent appellate review of the entire work must be con-
ducted by reviewing exhibit 1. However, exhibit 1, which is
recorded on ¾-inch pneumatic videotape, a size and grade gen-
erally used in professional broadcasting, is not readable by this
court on standard VHS equipment, and the parties have failed to
provide the appropriate equipment for playback as required
under Neb. Ct. R. of Prac. 5B(7) (rev. 1996). This court is, thus,
denied the performance of its duty and in my view should
refrain from evaluating the work as a whole by reviewing
exhibit 2, which is less than the whole work.

In sum, Harrold stands convicted of the production or distri-
bution of exhibit 1, the whole work. Our independent appellate
function is to review the work as a whole and as a matter of law
determine whether exhibit 1 is or is not obscene. Our indepen-
dent appellate responsibility is dictated by the U.S. Supreme
Court, the Nebraska Supreme Court, and statute, and not by a
trial stipulation between the parties as to how the jury could
perform its separate and distinct function. The inability of this
court to review exhibit 1 due to the failure of the parties to sup-
ply appropriate equipment for playback precludes our evalua-
tion of the work as a whole, and I believe our commenting on
the obscenity of the work based on a review of a part of the
work is not proper. I would, therefore, reverse without direction.

MUES, Judge, concurring.

From my personal viewpoint, Harrold's videotape was
bizarre and disgusting. That it was indiscriminately offered to
television viewers enhances its offensiveness to me, but I am
mindful that *how* it was distributed does not, as a matter of law,
change the crime or make obscene that which is legally not
obscene.

The first 14½ minutes can best be described as unintelligible
garble. It reminds me of a small child's making weird faces and
sounds while peering in a mirror believing no one to be watch-

ing. Frankly, that anyone (with a choice) could sustain interest in the videotape long enough to get to the last 90 seconds would amaze me. But I digress.

The last 90 seconds of this videotape shows a male clown masturbating. Is this obscenity? Viewed from a dictionary's definition of the term, it may be, although "absurd" seems the more fitting description when viewing the work as a whole. However, it is arguably indecent, tawdry, and uncouth. Nonetheless, personal disgust and dictionary definitions are not the benchmarks of our standard of review, rather, we are bound by the First Amendment and the definitions and standards promulgated by the U.S. Supreme Court, the Nebraska Supreme Court, and the Nebraska Legislature.

Applying those standards and definitions, Harrold's videotape is not obscene. I therefore concur in the result reached by Judge Sievers' well-reasoned opinion.